

Villanova University School of Law

2008 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

4-3-2008

# Kaita v. Atty Gen USA

Precedential or Non-Precedential: Precedential

Docket No. 06-3288

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2008

Recommended Citation

"Kaita v. Atty Gen USA" (2008). *2008 Decisions.* Paper 1301.
http://digitalcommons.law.villanova.edu/thirdcircuit_2008/1301

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2008 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

No. 06-3288

———

FATMATA KAITA,
                              Petitioner
              v.

ATTORNEY GENERAL OF THE UNITED STATES,
                              Respondent

———

On Petition for Review of an Order
of the Board of Immigration Appeals
(No. A97-965-177)
Immigration Judge:  Hon. Esmeralda Cabrera

———

Argued December 13, 2007

Before: SLOVITER, AMBRO, Circuit Judges,
and POLLAK,[*] District Judge

(Filed: April 3, 2008)

———

Matthew J. Harris (Argued)
Brooklyn, N.Y.  11215-0000

       Attorney for Petitioner
Ada E. Bosque   (Argued)

---

[*] Hon. Louis H. Pollak, Senior Judge, United States District Court for the Eastern District of Pennsylvania, sitting by designation.

Edward J. Duffy
United States Department of Justice
  Office of Immigration Litigation
Washington, D.C. 20044-0000

Regina S. Moriarty
United States Department of Justice Tax Division
Washington, D.C.  20044-0000

Attorneys for Respondent

———

OPINION OF THE COURT

———

SLOVITER, Circuit Judge.

Before us is a petition for review filed by Fatmata Kaita, a native and citizen of Sierra Leone, of the decision of the Board of Immigration Appeals ("BIA") denying her claims for asylum, withholding of removal, and CAT protection on the basis of the adverse credibility finding made by the Immigration Judge ("IJ").  Kaita claims that she was persecuted and tortured by the rebels who came to power in Sierra Leone in the 1990s.  We must decide whether the IJ's finding is supported by substantial evidence, as well as whether that finding was affected by the IJ's frequent interruptions during the removal hearing and the apparent translation problems during Kaita's testimony.

**I.**

A.      Factual Background

Kaita, who is fifty-six years old, was born and raised in Bo Town, Sierra Leone and lived there until 1997.  She attended a Muslim school in Sierra Leone for ten years (approximately equivalent to a ninth grade education).  She was married and has four children.

Kaita's husband disappeared in 1997, at a time when there were many attacks in Bo Town by rebel forces belonging

2

to the Revolutionary United Front ("RUF").[1] Kaita stated that her husband had gone to the mosque to pray very early in the morning on the day he disappeared, and that the rebels broke into her home at five o'clock that morning when she was alone with the children. The rebels asked where her husband was, "arrested," tortured and beat her and the children, and then set fire to their house. A.R. at 114.

Kaita stated that the rebels had killed her husband because he and she supported Ahmad Tejan Kabbah, the president of Sierra Leone. The rebels stated that they knew that Kaita and her husband supported the Sierra Leone People's Party ("SLPP"), the official governing party of Sierra Leone opposed by the rebels. Kaita testified that she had been a member of the SLPP for about one year prior to the rebel attack and that it was not a secret that she and her husband supported that party.

Kaita further testified that as a result of the 1997 attack she moved to Freetown into the home of her husband's brother. On January 6, 1999, while she was in Freetown, rebel forces captured her when she went out to get food for her children. The rebels detained her for nineteen days at a military barracks, where she was forced to cook and wash clothing for the rebels. She was also beaten, raped and tortured repeatedly throughout her detention by many different men. There were about twenty other women who were captured, and the rebels killed at least one of them. The rebels also threatened to kill Kaita.[2]

Ultimately, troops from other African countries rescued Kaita and took her to the hospital where she spent seven days

---

[1] The RUF is known for its extreme violence, including, inter alia, kidnapping women to use as sex slaves and forcibly recruiting child soldiers.

[2] Kaita's brief states that she testified that the rebels told her that it was known that she was an ethnic Mandingo and supporter of Ahmad Tejan Kabbah, but because that section of the transcript is indiscernible we can find only a reference to the rebels threatening Kaita due to her support for Ahmad Tejan Kabbah.

receiving treatment for the injuries she sustained from the gang rapes and beatings. Although she could not remember the exact dates when she was in the hospital, Kaita did testify that by January 25, 1999, she was at the hospital and out of pain. When Kaita was released from the hospital, she discovered that her husband's brother and her four children were missing. She learned that her children had been taken in by various neighbors. She testified that she remained in Freetown at the home of her husband's family for five years because she felt it had become safe due to the government's assurances that it had driven out the rebels. She left Sierra Leone in 2002 with her children and went to Guinea to live with her husband's friend.

Kaita's testimony that she obtained a passport in Freetown, Sierra Leone, in December 2002 is corroborated by her production of a passport dated December 23, 2002. At another point during her testimony, Kaita reiterated that she "left Sierra Leone the 12 month, the 29th." A.R. at 137. Kaita stayed in Guinea not quite three months before coming to the United States because the government of Guinea beat and arrested refugees from Sierra Leone. Her children remain in Conakry, the capital of Guinea.

There is some lack of clarity in the transcript regarding the dates when Kaita left Sierra Leone for Guinea and when she left Guinea for the United States. At one point, the transcript reads that Kaita left Sierra Leone "the two month, 29th, 2002," A.R. at 131, and she "left Guinea the 10 month the 15." A.R. at 132. At that point, however, Kaita's counsel stated, "I couldn't understand what the interpreter just said . . . Can you just repeat that?" A.R. at 132. The IJ then answered, "[h]e just said [s]he left Guinea the 3rd month the 16th," A.R. at 132, to which Kaita's counsel responded, "Oh, I keep hearing something . . . ." A.R. at 132. The IJ then sought clarification from Kaita, asking, "[a]nd you left Sierra Leone December of 2002. Is that right?" A.R. at 132. Kaita replied in the affirmative and also stated that she then left Guinea in 2003. Later, the IJ asked Kaita, "earlier you said that you had left Sierra Leone on March 29, 2002 to go to [Guinea]. How is it then that you got this passport issued to you [in Sierra Leone] December 23, 2002?" A.R. at 137. We have canvassed the record and find no instance in which Kaita

4

testified that she left Sierra Leone on March 29, 2002; the IJ's question, therefore, appears to have misstated Kaita's testimony.[3]

Kaita testified that she arrived in the United States on March 26, 2003 via Air France airlines. Although she had a Sierra Leonian passport in her own name, for unexplained reasons she borrowed a passport from her husband's friend to leave Guinea.

B.    IJ Conduct and Translation Issues

In her brief, Kaita argues that the IJ made it impossible for her to testify about her life in Guinea and then based her negative credibility finding in part on lack of detail. Our examination of the transcript supports this contention. The IJ interjected during Kaita's testimony no less than thirty-three times. Some of the interjections can be fairly characterized as exasperated expressions to Kaita (sometimes interrupting her testimony) and to the translator, some were admonishments to counsel to hurry up, and others were attempts to direct the questioning of Kaita. Although some interjections were reasonable attempts to clarify certain facts, other interjections appear to have been disruptive. What follows are some examples of those interjections.

During a preliminary proceeding held on July 20, 2004, when asked how old she was, Kaita responded (through the translator), "I'm 52 years old." A.R. at 96. The IJ asked, "You sure?" and Kaita responded, "I'm 51 but some over there." A.R. at 96. The IJ asked, "What?" To which Kaita replied, "I'm 51 but a little bit, some time over 51." A.R. at 96. The IJ then exclaimed, "Sometimes you're over 51, that's interesting. Okay. Let's move on here. It's just amazing. It's amazing for a

---

[3] The transcript then indicates that Kaita said that she "left Sierra Leone the 10th month." A.R. at 137. That answer is inexplicable in light of the fact that in her next answer, responding to the IJ's attempt at clarification, Kaita testified that she "left Sierra Leone the 12 month, the 29th" of 2002. A.R. at 137.

Wednesday morning what one hears." A.R. at 97. Counsel and the IJ then agreed that Kaita was in fact 51 years old, but would turn 52 in a few months, thereby supporting her assertion that she was "some time over 51." Kaita never said that she was "sometimes" over 51.

During the principal evidentiary hearing, when Kaita explained that she could no longer remember the exact date in 1997 on which her husband disappeared because it had been a traumatic event, the IJ interrupted, asking, "excuse me, ma'am, you expect me to believe that your husband goes missing and you don't remember the day he goes missing? . . . ." A.R. at 111. Then when counsel asked Kaita what happened to her that day (as distinct from her husband), the IJ said, "What day, I don't know what day. All I know is the year." A.R. at 111. Later, when Kaita was explaining what happened to her during the 1997 Bo Town incident, the IJ interrupted to say, "ma'm, what happened, just tell me what happened. Did anything happen?" A.R. at 113-14. In another instance, after Kaita's counsel asked her about the governing structure in Sierra Leone, the IJ said, "Counsel, what kind of question is that?" A.R. at 110.

When counsel was asking Kaita about her experience in the military camp in which she was gang raped, the IJ interjected, "Can you just stop her please. Don't let her continue going on." A.R. at 118. When Kaita attempted to explain how another woman at the military camp had been killed by the rebels in the 1999 incident, and stated, "they used to torture us and beat us and the way they raped that lady, she bleeded, there was a lot of blood coming from her until she, she died," A.R. at 119, the IJ immediately interjected, in perhaps the most disturbing example of the IJ's conduct at the hearing, "Okay, so she bled to death. Let's move on." A.R. at 120.

In addition, the transcript reveals that the IJ hurried Kaita and her counsel through the proceedings. She stated soon after the hearing began, "Counsel, please, I have a case at 10:30. I

6

need to hear this today."[4]  A.R. at 109.  When Kaita was explaining her hospital treatment following the gang rape, the IJ stated, "Okay, let's move on."  A.R. at 122.  Later in the same discussion, the IJ told Kaita's counsel, "Proceed counsel, please, I'd like to wrap this up now."  A.R. at 123.  During the part of the testimony in which Kaita talked about the dates when she left Sierra Leone for Guinea and Guinea for the United States, the IJ asked, "Counsel, anything further?"  A.R. at 131.  And then a very short time later, "Okay, anything else, counsel?"  A.R. at 132.  At one point, Kaita's counsel asked permission to engage in a line of questions regarding Kaita's passport, and the IJ said, "counsel, it is 10:30 and we've done nothing here, come on, let's finish this up."  A.R. at 133.  Counsel asked permission to ask "[j]ust a couple more questions."  A.R. at 133.  To which the IJ responded, "No, not a couple more questions.  Wrap it up. . . . That's it."  A.R. at 133.

The IJ also interrupted, directed Kaita's testimony, and on occasion apparently created confusion.  For example, when Kaita was trying to explain the January 1999 incident, the IJ told her she did not want to hear about whether the children were hungry; she just wanted to hear what happened.[5]  When Kaita's counsel asked why the rebels attacked her, the IJ cut off counsel's question and said she wanted to know where Kaita was when she was beaten.  There are numerous examples when the IJ

_____

[4] Even though the IJ had another "case" on her docket, that burden cannot be laid at Kaita's feet.  At a hearing held on July 20, 2004, the IJ asked Kaita's counsel how long he would need to conduct the full hearing, and he told the IJ he needed two hours.  The IJ set the hearing for nine o'clock in the morning on February 14, 2005.  If the IJ had another matter scheduled at 10:30, that would only have allowed ninety minutes, not two hours, for Kaita's case.

[5] Kaita stated, "I went to buy food for my children.  The children in the house was hungry."  A.R. at 116.  The IJ asked, "What?"  To which Kaita replied, "The children was home hungry."  A.R. at 116.  The IJ then said, "Ma'm, I said what happened not whether the children were hungry."  A.R. at 116.

7

directed the questioning of Kaita, usurping counsel's role.

After counsel advised the IJ at a preliminary hearing that Kaita's best language was Mandingo, the IJ procured a Mandingo translator who remained for each of the subsequent proceedings. It appears that there was significant difficulty with the translation, as both the IJ and the translator had numerous problems understanding each other, and there are sections of the transcript that are effectively unintelligible. During Kaita's testimony, the IJ interjected, "For the record, the respondent was correcting the interpreter's translation in English, so she's obviously understands English [sic]." A.R. at 107.

There were instances where the IJ either explicitly stated that she could not understand the interpreter or the testimony came out indiscernible. See, e.g., A.R. at 117, 118, 119, 130, 131, 132. Most of those instances occurred during key testimony, including, for example, Kaita's discussion of her dates of entry, see A.R. at 132, which was one of the principal bases for the IJ's finding that Kaita was incredible.

At one point, the IJ said, "counsel, excuse me, I would like the respondent right now to get up and trade seats with the interpreter instead of her leaning over your notes and reading her statement. . . . I'm satisfied that she speaks English and understands it. . . Ma'am, change seats with the interpreter . . . well excuse me, I, I, at this point in time having said she doesn't speak English but having her correct the English translation of the interpreter, now at least twice, I [am] really not willing to give that statement the benefit of the (indiscernible)." A.R. at 112. The fact that Kaita corrected the translator does not mean that she understands English well, much less to communicate fully during a legal proceeding; it could mean that she understood some English, and in some instances as well as or better than the interpreter. A short time later, the IJ said to the interpreter, "what are you doing, just translate, okay? . . . I don't want you making any kind of movements here. . . . Your job is only to translate. . . . You don't have to try and enact things out. You're not in the theater." A.R. at 115. At another point, the IJ told the translator, "What are you translating, I don't understand you. . . . What is it you're talking about?" A.R. at 121. With

8

respect to the injuries Kaita sustained at the military barracks, the IJ had to ask the translator three times to clarify what he was saying.

C.    IJ Decision

After the hearing, the IJ issued her oral decision, in which she concluded that Kaita's entry date and location were unknown. According to the record, Kaita filed an application for asylum on October 29, 2003, but the record fails to show when she entered the United States. Thus, the IJ decided that Kaita had not shown that she had filed the application for asylum within one year of her date of entry. Nonetheless, the IJ reviewed Kaita's entire application, including the request for asylum. The IJ concluded that Kaita had "not testified in a believable, consistent nor persuasive fashion and as such has not met her burden of proof." A.R. at 81. Specifically, the IJ found Kaita's testimony to be "extremely vague and lacking in specificity." A.R. at 81.

The IJ pointed to the (1) "huge time gaps" in Kaita's testimony/failure to remember precise dates, A.R. at 81, and (2) contradictions in Kaita's testimony. With respect to timing, the IJ said that Kaita could not remember precise dates for important events, such as her husband's disappearance. The IJ asserted that this was significant because the disappearance of her husband seemed to be a memorable event. The fact that Kaita could not remember the date "certainly raises questions regarding this respondent's claim," according to the IJ. A.R. at 82. The IJ also thought that the fact that Kaita could not remember the precise date of her hospitalization after being gang raped for nineteen days in 1999 "present[ed] additional questions regarding the respondent's credibility." A.R. at 82.

The IJ also stated that Kaita's testimony was at odds with her written submissions. The only example the IJ provided was that Kaita said she was persecuted due to her ethnicity in her Form I-589, but her testimony did not mention ethnic persecution.

With respect to the IJ's asserted contradictions, the IJ

9

cited conflicting testimony about where and when Kaita obtained her passport. Kaita's passport was issued on December 23, 2002. The IJ stated that Kaita had initially testified that she departed Sierra Leone for Guinea on March 29, 2003, but that contradicted the fact that the passport was obtained in Sierra Leone in December 2002.

Finally, the IJ concluded that "this respondent has not been totally persuasive and consistent and it appears that much of this claim that's been presented is not really believable." A.R. at 83. The IJ stated that it was more likely that Kaita left Sierra Leone "because of the suffering and the financial hardship and the difficulties in the living conditions more than on any possible grounds of persecution." A.R. at 83. Because the IJ concluded that Kaita had not met her burden of proof on the asylum claim, she necessarily decided that Kaita had not met her burden of proof on the withholding of removal claim and the CAT claim. The IJ stated that Kaita had not, in light of the entire record, "presented a consistent, believable, and sufficiently detailed claim to support a grant of political asylum . . . ." A.R. at 84.

D.     BIA Decision

The BIA adopted and affirmed the IJ's decision in a written decision that included several additions. It stated that Kaita failed to meet the one-year filing deadline for filing a petition for asylum because there had been multiple discrepancies with respect to the date of Kaita's arrival in the United States. The BIA also stated that the IJ's adverse credibility finding was sufficiently supported by the record because of the lack of details in Kaita's testimony and her failure to remember precise dates. The BIA did not find that the IJ's comments and interruptions or Kaita's lack of education sufficiently explained the discrepancies in the record.

Kaita timely filed her petition for review.

**II.**

When the BIA's decision substantially relies upon the decision of the IJ, this court has jurisdiction to consider the IJ's

10

decision, as well as the BIA's decision. Xie v. Ashcroft, 359 F.3d 239, 242 (3d Cir. 2004). Because the BIA adopted the IJ's adverse credibility determination and added to that conclusion, we consider both the IJ's decision and that of the BIA.

This court reviews adverse credibility determinations under the substantial evidence standard. Id. at 243. "Under [that] standard, the [BIA's] adverse credibility determination must be upheld on review unless 'any reasonable adjudicator would be compelled to conclude to the contrary.'" Gao v. Ashcroft, 299 F.3d 266, 272 (3d Cir. 2002) (quoting 8 U.S.C. § 1252 (b)(4)(B)). Because Kaita's petition was filed before May 11, 2005, the effective date of the REAL ID Act, the applicable law was that minor inconsistencies did not support an adverse credibility finding. Id. It was clear then that discrepancies in a petitioner's testimony must involve the "heart of the asylum claim" in order to support an adverse credibility finding. Id. (citation and internal quotations omitted).[6] We have held that "[a]dverse credibility determinations based on speculation or conjecture, rather than on evidence in the record, are reversible." Id. (citation omitted).

### III.

We turn now to examine Kaita's claims.

A.      Asylum

As a threshold matter, an alien seeking asylum must prove by clear and convincing evidence that she filed her application for asylum within one year of her arrival in the United States. 8 U.S.C. § 1158(a)(2)(B). A court may consider an untimely asylum application only if the alien can demonstrate changed circumstances that affect her eligibility for asylum or extraordinary circumstances why she did not file the application

---

[6]     Under the REAL ID Act, "a trier of fact may base a credibility determination . . . without regard to whether an inconsistency, inaccuracy, or falsehood goes to the heart of the applicant's claim. . . ." 8 U.S.C. § 1158(b)(1)(B)(iii).

11

within one year.  Id. § 1158(a)(2)(D).  However, "[n]o court shall have jurisdiction to review any determination of the Attorney General under [§ 1158(a)(2)]."  Id. § 1158(a)(3).

Both the IJ and the BIA made the determination under § 1158(a)(3) that Kaita failed to prove by clear and convincing evidence that she had filed her asylum application within one year of her date of entry.  In light of that finding, we have no jurisdiction to review Kaita's claim for asylum.  See 8 U.S.C. § 1158(a)(3).

B.     Withholding of Removal

In order to qualify for  withholding of removal,[7] a petitioner must establish a "clear probability," that is, that "it is more likely than not" that her life or freedom would be threatened if returned to her country due to her race, religion, nationality, membership in a particular social group, or political opinion.  Zubeda v. Ashcroft, 333 F.3d 463, 469 (3d Cir. 2003) (citations and internal quotations omitted).  If an applicant meets that standard, the Attorney General must grant withholding of removal.  8 U.S.C. §1231(b)(3)(A).  An applicant can meet the standard by proving past persecution, which creates a rebuttable presumption of future persecution.  8 C.F.R. § 1208.16(b)(1).  That presumption can be rebutted if there has been a fundamental change in circumstances in the country of origin or if the applicant could safely move to another part of the country.  Id.

The IJ rejected Kaita's withholding claim because the IJ concluded that she had "not testified in a believable, consistent nor persuasive fashion and as such has not met her burden of proof."  App. at 81.  As we noted above, the IJ attributed her adverse credibility finding to Kaita's inconsistency and vagueness with respect to timing and to contradictions in her overall testimony.

_____

[7] We have jurisdiction to review final orders of removal pursuant to 8 U.S.C. § 1252(a)(1).

1.    Timing

First, the IJ said that there were "significant time gaps that raise many questions regarding the claim itself."  A.R. at 81.  That conclusion is not adequately supported by the evidence.  After searching the record, we are unable to pinpoint any significant time gaps.  The record evidence supports the following:  Kaita and her family were attacked in Bo Town in 1997.  She moved to Freetown at that time, was attacked in 1999, and left for Guinea in 2002.  That is a total of five years in Freetown.  From Guinea, Kaita came to the United States.  There are no "time gaps" in the testimony, certainly no significant ones.  Notwithstanding the IJ's suggestion of confusion regarding the five years Kaita spent in Freetown, the testimony reveals that the five years Kaita spent living with her husband's family in Freetown included the time before and after the 1999 attack.

The IJ also stated that Kaita was not able "to provide dates when significant events allegedly occurred," A.R. at 81, citing as examples the disappearance of Kaita's husband and Kaita's hospitalization following being gang raped in a military barracks.  Although Kaita could not remember the month and day that her husband disappeared, she clearly remembered that the year was 1997.  She said she could not remember the exact date because it was so traumatic.  We conclude that the exact date of Kaita's husband's disappearance does not go to the heart of her claims, see Gao, 299 F.3d at 272, which is her capture, detention, and mistreatment by the rebels.  In addition, there is a great deal of confusion in the record in connection with the timing issue.  The IJ interrupted to question Kaita; the translator was having trouble translating correctly; and either the translator or Kaita apparently could not understand the IJ's question, as demonstrated by the question to the IJ, "what do you mean?" following the IJ's question regarding the exact date when the husband disappeared.  A.R. at 110.

With respect to the date of hospitalization, the IJ's conclusion that Kaita's testimony "present[ed] additional questions regarding the respondent's credibility," A.R. at 82, is surprising.  The IJ stated, "when [Kaita] testified about the rape

13

and being hospitalized, she indicated that she could not recall the dates of her hospitalization or when these events in question had precisely happened other than that they had happened some time in 1999 because allegedly she was in such pain that she was unable to recall the date." A.R. at 82. The IJ then stated, "[s]ubsequently when queried further, the respondent then testified that she believed it was January 25th." A.R. at 82.

But the IJ's characterization of that testimony is not accurate. What actually occurred was that the IJ interrupted Kaita's counsel to take over the questioning of Kaita with respect to the 1999 incident. Then the IJ asked Kaita, "Okay, ma'm, and then what, what, when was it that you were actually in the hospital?" A.R. at 122. Kaita answered, "I can't recall because I was in pain." A.R. at 122. The IJ asked, "Well, can you recall after you were out of pain when that was?" A.R. at 123. At that point, Kaita stated, "When I was at the hospital actually it was the first month the 25th." A.R. at 123. The IJ then said, "Proceed counsel, please, I'd like to wrap this up now." A.R. at 123.

Kaita never said that she could not recall any date at which she was in the hospital; rather, she could not remember when it was that she was in the hospital (i.e., when she entered the hospital). But when asked if she remembered a date while in the hospital after the pain subsided, Kaita readily provided a date of January 25th. She never said she "believed" it was the 25th, as the IJ characterized Kaita's testimony; rather she clearly stated that when she was out of pain, she was at the hospital on January 25th. In this respect, the IJ's conclusion is not supported by substantial evidence because it relied upon a non-accurate characterization of the record evidence. Moreover, the exact date of Kaita's hospitalization following her experience of being brutally gang-raped does not go to the heart of Kaita's claim. It is the fact of having been gang-raped that does. Once again, the IJ's explanation is not a sufficient basis for making an adverse credibility finding.

In further support of her conclusion that the timing issues supported an adverse credibility finding, the IJ stated that "the testimony provided by this respondent is at odds with her written

14

submissions and also at odds with her own testimony before the Court." A.R. at 81. Later in her decision, the IJ stated that Kaita "[i]nitially" testified that she departed Sierra Leone on March 29, 2003 and traveled to Conakry, Guinea, but subsequently testified that she had obtained a passport on December 23, 2002. A.R. at 82. The IJ stated that because Kaita had also testified that she actually left Sierra Leone on March 29, 2002, it would have been impossible for her to have gotten a passport in Sierra Leone in December 2002 inasmuch as Kaita never went back to Sierra Leone once she left. A.R. at 82.

A close reading of the testimony shows that Kaita testified that she arrived in the United States in March 2003, and that she had been in Guinea for three months prior to leaving for the United States. That would have dated Kaita's departure from Sierra Leone to Guinea in December 2002. When asked by the IJ if she left Sierra Leone for Guinea in December 2002, Kaita said yes. That testimony is also consistent with the IJ's later questioning regarding the date when Kaita obtained the passport, to which Kaita answered she obtained it in Sierra Leone in December 2002, and then left Sierra Leone very soon after that. Thus, most of Kaita's testimony regarding the dates was consistent. The fact that at one point during the complicated recitation of dates Kaita stated that she left Sierra Leone in March 2002 is a minor inconsistency that does not go to the heart of her claims, especially in light of the IJ's continued interruption of the flow of Kaita's testimony and the obvious problems with the translation referred to above.

There are two other instances where the testimony appears to be inconsistent, although they appear to have arisen due to problems with the translation. For example, after already answering that she departed Guinea for the United States in March 2003 after being there for three months, Kaita testified that she left Sierra Leone in the "two month, 29th, 2002." A.R. at 131. Then, when asked when she left Guinea, she said the "10 month the 15th." But at that point both the IJ and Kaita's counsel began questioning the interpreter, and then the IJ said, "he just said she left Guinea the 3rd month the 16th." A.R. at 132. The IJ then asked the translator if that was correct (i.e., leaving Guinea in the third month) and the translator said yes.

15

The transcript of that entire dialogue is unclear and lacks the indicia of reliability on which to base an adverse credibility finding, particularly where another section of the transcript reveals that Kaita's dates may have been consistent. Moreover, after carefully reviewing the transcript, we can find no instance in which Kaita testified that she left Sierra Leone on March 29, 2002, contrary to the IJ's statement in her oral opinion. The only discrepancy about the date when Kaita left Sierra Leone is her statement reported by the translator that she said she left the "two month, the 29th." A.R. at 131. Because Kaita had already testified that she left Sierra Leone in December, i.e., the "twelve month," it seems highly plausible that when the translator said "two month," it was meant to be "twelve month."

In fact, when the IJ clarified with Kaita, "And you left Sierra Leone in December 2002, is that right?," she responded, "Yes, that's when I left." A.R. at 132. Kaita's position is that she was in Freetown from 1997 to December 2002, at which time she obtained a passport and went to Guinea. Kaita remained in Guinea for three months. Although Kaita stated that she left for the United States in March 2003, the IJ and the BIA concluded that was not proven.

In sum, Kaita's omissions or so-called vagueness with respect to the date of her husband's disappearance and the date of her hospitalization do not go to the heart of her claim. To the extent that there are a few instances of apparently inconsistent testimony, those instances may have been the result of either translation problems or the IJ's interruptions, and the IJ herself clarified some of those inconsistencies during the testimony.

    2.      Contradictions/Lack of Details

The IJ also stated that she made an adverse credibility finding due to the contradictions in Kaita's testimony, but the only examples she gave were those discussed above with respect to timing. The IJ also stated that Kaita failed to provide specifics about "what actually transpired to this respondent. . . ." A.R. at 83.

That conclusion is unacceptable given the record before

16

the IJ.  Kaita explained in great detail that she and her children were beaten and their house was burned down, that she was kidnapped by the RUF rebels and was taken to their barracks and was forced to wash and launder for them, that she was raped by one rebel after another on multiple occasions, and that on both occasions (in 1997 and 1999) the rebels told her they were targeting her due to her support of the SLPP/the presidential government of Sierra Leone.  Moreover, Kaita explained with whom she was staying, what she did to earn a living, and what was the status of her children at all times.

Moreover, the IJ's statement that she would have liked to have heard more detail is inconsistent with her frequent interruptions of Kaita when Kaita attempted to provide such detail, and the IJ's obvious efforts to rush the proceedings by continually reminding counsel about her 10:30 a.m. matter when counsel was attempting to elicit more detail.

Finally, the IJ noted that Kaita's testimony made no reference to persecution on account of ethnicity.  Persecution need not be on account of ethnicity; it can also be on account of political belief.  Here, Kaita testified on multiple occasions that she was singled out due to her membership in the SLPP and her support for the elected president.   Indeed, when Kaita's counsel asked her at the evidentiary hearing why the rebels had attacked her, the IJ prevented her from answering by interrupting, "Counsel, I'd like to find out what happened after this.  I mean she said they beat her, where was she?"  A.R. at 116.  After Kaita provided an answer that is partially unintelligible on the record copy of the transcript, the IJ interjected again and directed the questioning of Kaita for some time regarding the issue of where the rebels held her captive.  The questioning never returned to the topic why the rebels had attacked Kaita.  The IJ's interruption seemingly frustrated what could have been an opportunity for Kaita to elaborate on the basis for her persecution claim.  Moreover, there is some evidence that the rebels referred to Kaita's Mandingo ethnicity while she was detained at their military barracks.  The IJ's decision does not discuss any of that evidence, but rather summarily concludes that there was no evidence of any ground of persecution.

For the reasons set forth, we conclude that the adverse credibility finding made by the IJ and adopted by the BIA is not supported by substantial evidence.

C.    CAT Claim

To qualify for relief under Article 3 of the CAT, a petitioner must show that "it is more likely than not that he or she would be tortured" if returned to the proposed country of removal. <u>Zubeda</u>, 333 F.3d at 471 (citation and internal quotations omitted). This standard differs significantly from a "reasonable fear of persecution" for asylum, because it has no subjective component and requires the petitioner to establish entitlement to relief on the basis of objective evidence. <u>Id.</u> (citation and internal quotations omitted)

Unlike the asylum and withholding standards, a person seeking protection under the CAT need not establish that she is a "refugee," and therefore need not prove that she was persecuted due to any protected status. Rather, to state a claim under the CAT, the applicant must show that she will more likely than not be tortured. That standard has been applied when the government is unwilling or unable to protect its citizens from persecution. <u>Silva-Rengifo v. Attorney Gen.</u>, 473 F.3d 58, 65 & n.6 (3d Cir. 2007).

Torture is defined as:

an act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or her or a third person information or a confession, punishing him or her for an act he or she or a third person has committed or is suspected of having committed, or intimidating or coercing him or her or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.

<u>Zubeda</u>, 333 F.3d at 472 (quoting 8 C.F.R. § 208.18(a)(1)). The

18

distinguishing feature of torture is the severity of pain inflicted. Id. Rape can be torture. Id.

Kaita testified that she had been brutally beaten and raped on multiple occasions by the RUF rebels who had, in effect, taken over the government of Sierra Leone. But the IJ did not consider the evidence, instead concluding that she had "failed to present any evidence that would support a conclusion that it would be more likely than not that she would be tortured if removed to Sierra Leone." A.R. at 84.

Neither the IJ nor the parties discussed the State Department Country Reports for Sierra Leone. The Country Report for 2001 explained that the elected government of Sierra Leone did not effectively control the entire country that year, but that the RUF rebels exercised de facto control over some areas of the country. U.S. Department of State, Country Report on Human Rights Practices (2001).[8] The Report also stated that the RUF rebels had abducted many women to use as "sex slaves," and that acts of violence and rape were prevalent. Id. The Country Report for 2006, however, announced the return to power of the democratically elected government, the SLPP, and the decrease in power of the RUF rebels. See U.S. Department of State, Country Report on Human Rights Practices (2006).[9] The 2006 Report suggests that, although there are still some serious problems in many areas of Sierra Leone, the country conditions have greatly improved.

Neither the IJ's decision nor the BIA's decision refers to country conditions as a factor in the analysis whether circumstances have changed since the time of Kaita's emigration and subsequent petition in the United States. It may be that both Kaita's withholding of removal claim and CAT claim are foreclosed due to changed circumstances in Sierra Leone. But we cannot, as a court of appellate jurisdiction, consider the Country Reports in the first instance. Rather, we must review

---

[8] http://www.state.gov/g/drl/rls/hrrpt/2001/af/8402.htm.

[9] http://www.state.gov/g/drl/rls/hrrpt/2006/78756.htm.

19

only that rationale provided by the IJ and BIA for their decisions, namely that Kaita was not credible and that she submitted no evidence to show that it is more likely than not that she will be tortured if returned to Sierra Leone. See Li v. Attorney Gen., 400 F.3d 157, 163 (3d Cir. 2005) (quoting SEC v. Chenery Corp., 332 U.S. 194, 196 (1947) ("[A] reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency. If those grounds are inadequate or improper, the court is powerless to affirm the administrative decision by substituting what it considers to be a more adequate or proper basis.")).

**IV.**

The members of this court receive many petitions for review and necessarily review numerous hearing transcripts. The transcript in this case stands out because of the extent of the IJ's interruptions, frequently in what appears to be an antagonistic manner. We recognize the burden under which the immigration judges are working, but if the applicant, aided by counsel, is unable to complete his or her testimony, our review is seriously impeded. This is such a case. We venture no view as to whether Kaita is entitled to withholding of removal or protection under the CAT. We leave that decision to the agency.

For the reasons set forth above in some detail, we will vacate the adverse credibility decision of the BIA and IJ on the basis that the asserted inconsistencies and omissions are minor and do not go to the heart of Kaita's claims, and that the IJ's adverse credibility finding is not supported by substantial evidence. We will also vacate the decisions of the BIA and IJ concluding that Kaita submitted no evidence of likely torture if returned to Sierra Leone. We will remand for further proceedings consistent with this opinion, including additional testimony before the IJ if necessary, as well as full consideration of the current status in Sierra Leone as reflected in the State Department Country Report.

We will deny Kaita's petition with respect to the asylum claim. We will grant the petition with respect to the withholding

20

and CAT claims and remand for further proceedings consistent with this opinion.