**Toumany FOFANA, Petitioner**

v.

**ATTORNEY GENERAL OF the UNITED STATES.**

**No. 08–4144.**

United States Court of Appeals, Third Circuit.

Submitted Pursuant to Third Circuit LAR 34.1(a) Sept. 24, 2009.

Opinion filed Oct. 9, 2009.

Thomas V. Massucci, Esq., New York, NY, for Petitioner.

Kate Deboer Balaban, Esq., Thomas W. Hussey, Esq., Carl H. McIntyre, Jr., Esq., Benjamin Zeitlin, Esq., United States Department of Justice, Office of Immigration Litigation, Washington, DC, for Respondent.

Before: AMBRO, FISHER and JORDAN Circuit Judges.

## OPINION

PER CURIAM.

Toumany Fofana petitions for review of an order of the Board of Immigration Appeals (BIA), which dismissed his appeal from an Immigration Judge's (IJ's) final removal order. We will deny the petition.

Fofana is a native and citizen of Mauritania. He arrived with false documents in December 2002. He filed an application for asylum and conceded removability. He sought relief based on his claim that he was slave who escaped from his master, and that if he were to be returned to Mauritania, his master would kill him. In a hearing before an IJ, Fofana testified that his parents were born into slavery, as was he. A.R. 88.[1] His master was a white

---

1. According to documents in the record, slavery has been outlawed in Mauritania several times, but it apparently still exists in some places. *See e.g.,* U.S. Department of State, Country Reports on Human Rights Practices—Mauritania for 2005, at 13; A.R. 179. *See also* articles at A.R. 216–30.

Moor. *Id.* He is of the Soninke ethnic group. A.R. 85. He helped his father herd cattle when he was younger, and took over the job at the age of 15, when his father was too old to work. A.R. 88. Fofana testified that he was whipped and beaten with a baton frequently, but that he did not have any permanent marks or scars from the beatings. A.R. 90–93. In December 2000, his father fell ill. They begged the master to get him medical attention, but he refused, and his father died a week later. A.R. 90, 199. Fofana became determined to escape. He secretly sold four head of cattle. A.R. 94. He had a birth certificate, and had recently obtained an identity card. A.R. 129. He and his mother and siblings[2] escaped to Mali. A.R. 94. Although he could not legally work in Mali, he found some employment with Mr. Dianguine Makadji, with whom he bore a striking physical resemblance. A.R. 103.

Makadji allowed him to "borrow" his passport, which contained a business visa for the United States. Makadji also apparently used the wages owed to Fofana to purchase a plane ticket and give him the equivalent of about $500.00. A.R. 99, 105–06. Fofana claimed that he is unable to read or write in any language. A.R. 108, 117. His seatmate helped him fill out his I–94 form on the airplane. *Id.* When they arrived at JFK, he found someone who spoke his language who translated for him in the inspection interview. That person wrote down a Manhattan address for him, and gave it to a cab driver to take Fofana there. A.R. 110–11. The address was a place where other Mauritanians lived, and he stayed there for about a year. A.R. 113–14.

The IJ made an adverse credibility finding based on questions regarding: (1) Fofana's identity card; (2) the lack of any marks on Fofana's body from alleged frequent beatings; (3) Fofana's story of how he borrowed the passport and how a stranger helped him in his airport interview; and (4) Fofana's testimony that two submitted letters from friends back home (which did not mention slavery) were unsolicited, but that other letters, which he had misplaced, spoke about the problems of slavery in Mauritania. Because the IJ found that Fofana was not credible, he denied asylum and withholding of removal. The IJ also found no evidence that Fofana would be tortured if he were to return to Mauritania.

The BIA adopted and affirmed the IJ's decision, and stated that it agreed that Fofana was not credible. The BIA recognized that the IJ "cited numerous factors in his adverse credibility determination," and noted "in particular, the discrepancies cited by the Immigration Judge regarding [Fofana's] Mauritanian identity document and the forensics report (I.J. at 9; Tr. at 79) and the respondent's implausible testimony about his inspection when he arrived in the United States and the assistance of the stranger (I.J. at 7, 10), a matter which is adequate to be a factor in an adverse credibility determination." A.R. 2.

An adverse credibility finding is reviewed under the substantial evidence test, and must be upheld unless "any reasonable adjudicator would be compelled to conclude to the contrary." *Gao v. Ashcroft,* 299 F.3d 266, 272 (3d Cir.2002) (quoting 8 U.S.C. § 1252(b)(4)(B)). An adverse credibility finding cannot be supported by spec-

---

**2.** Two different asylum applications in the record state in the attached narrative that Fofana has a sister. He denied that at the hearing before the IJ, stating that he had only two brothers, and that the person who pre-

pared his applications must have misunderstood. A.R. 86, 94, 127. The IJ does not seem to have considered this discrepancy in making his adverse credibility finding.

ulation, conjecture or minor inconsistencies, but must involve discrepancies that go to the "heart of the asylum claim." *Kaita v. Attorney General*, 522 F.3d 288, 296 (3d Cir.2008).[3]

We hold that the IJ's adverse credibility finding is supported by substantial evidence. We agree with the BIA that the questions regarding Fofana's identity card particularly support the finding. First, the record notes that the card was issued in 1996, but that Fofana did not receive it until three years later. A.R. 133–34. Fofana had no explanation for this oddity. Fofana also insisted that the card was issued without a picture or fingerprint, and that he added those later. A.R. 134. There is no evidence in the record that the government of Mauritania would issue an identity card without a picture or seal. Fofana's identity goes to the heart of his claim; failure to establish his identity undermines any claim that he is a former slave.[4] The BIA also cited Fofana's "implausible testimony about his inspection when he arrived in the United States and the assistance of the stranger" as a factor supporting the adverse credibility finding. We find it is not entirely implausible that Fofana could have found, among people disembarking from a flight from Mali, someone who spoke his language and who was willing to assist him. However, the IJ, who has heard many asylum cases, found that the details of Fofana's story, including his alleged use of his employer's passport, were more consistent with those of a person who had used a smuggler to gain entry to the United States. A.R. 35.

Because the evidence in support of Fofana's credibility is not "so compelling that no reasonable factfinder could conclude as the [IJ] did," *see Kayembe v. Ashcroft*, 334 F.3d 231, 234 (3d Cir.2003), we will deny the petition for review.

---

3. The provisions of the Real ID Act of 2005 regarding review of adverse credibility findings do not apply to cases such as this one, where the asylum application was filed before the enactment of the Real ID Act. Real ID Act of 2005, Pub.L. No. 109–13, Div. B, § 101, 119 Stat. 231 (May 11, 2005).

4. The IJ also questioned why Fofana's father would not obtain cards for the whole family rather than just Fofana. However, Fofana testified that his father may have obtained cards for the whole family; he did not know whether other family members had cards. A.R. 135–36. We thus do not consider this factor as supporting the adverse credibility finding.