NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 10-1273
_____

RIGOBERTO BEDOYA; GIRLESA BEDOYA,
                                        Petitioners

v.

ATTORNEY GENERAL OF THE UNITED STATES,
                                        Respondent

_____

On Petition for Review of an Order of the
Board of Immigration Appeals
(Agency Nos. A097-447-404 & A097-447-407)
Immigration Judge:  Honorable Margaret R. Reichenberg
_____

Submitted Pursuant to Third Circuit LAR 34.1(a)
March 25, 2011

Before:  FUENTES, SMITH, and GREENBERG, Circuit Judges

(Filed : May 25, 2011 )

_____

OPINION
_____


GREENBERG, Circuit Judge.

        Lead petitioner Rigoberto Bedoya and his sister, Girlesa Bedoya, petition for

review of the Board of Immigration Appeals' ("BIA") decision and order of December 28, 2009, affirming an Immigration Judge's ("IJ") final order of removal of May 16, 2008, in these consolidated removal proceedings. For the reasons that follow, we will deny their petition.

## I. BACKGROUND

Petitioners are natives and citizens of Colombia. Rigoberto entered the United States on a visitor visa in 1999 and returned to Colombia in 2003 but, after 25 days in that country, he departed Colombia again and re-entered the United States on another visitor visa. He has remained in this country ever since. Girlesa entered the United States on a visitor visa in 2001 and has remained in this country since that time. In 2005, the Department of Homeland Security initiated removal proceedings against both petitioners on the ground that they overstayed the time their visas authorized them to be in the United States. Petitioners conceded their removability but applied for withholding of removal and relief under the Convention Against Torture ("CAT").[1]

In May 2008, an IJ held a consolidated hearing on petitioners' withholding of removal and CAT applications. Rigoberto testified that, beginning in 1987, he served as the secretary for police inspections in Andes, Antioquia, Colombia, a remote rural area, even lacking in telephone service, where one of his duties was to investigate activities of

---

[1] In view of the usual one-year deadline provision for applications for asylum after an alien's arrival in the United States set forth in 8 U.S.C. § 1158(a)(2)(B), petitioners were not eligible for asylum at the time that the Department initiated the removal proceedings.

2

the Revolutionary Armed Forces of Colombia ("FARC"), a guerilla group. Around 1992, apparently while he was investigating the death of one of his uncles, armed FARC members came to his office and told him that if he did not resign his post and leave Andes, they would kill him. At first Rigoberto did not comply with the demand, but about one year later he resigned from his position and moved to Medellin (another part of Antioquia), a major metropolitan area, where he opened a store. After that move FARC members began calling him in Medellin about every other week, threatening to kill him if he did not give them money. He asserts that these threats caused him to leave Colombia and come to the United States in 1999.

After Rigoberto departed Colombia, Girlesa began receiving phone calls from FARC members who threatened to kill her if she did not divulge Rigoberto's whereabouts. FARC members made their last phone call to Girlesa in 1999. In 2001, she, too, left Colombia and came to the United States.

In 2003, Rigoberto, believing conditions in Colombia had improved, returned to Medellin. When back in Colombia he learned that FARC had murdered friends and individuals with whom he had worked on the police force. As we have indicated, 25 days after he returned to Colombia, Rigoberto again departed and came to the United States. Nevertheless, his parents and two of his siblings live in Colombia and FARC has not harmed them.

The IJ denied petitioners' applications in an oral opinion on May 16, 2008, and

3

issued a final order of removal on that day. In rejecting their requests for withholding of removal, the IJ concluded that the FARC threats did not constitute past persecution of either petitioner, and that neither petitioner had shown an objectively reasonable fear of future persecution. The IJ also held that neither petitioner had satisfied the standard for CAT relief.

Petitioners appealed to the BIA which, in its decision and order of December 28, 2009, affirmed the IJ's decision and order. The BIA, in rejecting petitioners' requests for withholding of removal, concluded that petitioners "have not established a clear probability of persecution in Colombia," as it indicated that the unfulfilled threats made against them did not constitute past persecution. App. at 2. The BIA further concluded their "'particular social group claim,' based [on] the lead respondent's status as a former police officer and/or a former investigating supervisor into the FARC guerrillas, is unavailing because the respondents have not demonstrated that what befell associates of the lead respondent was on account of their membership in the described group." Id.

The BIA also rejected petitioners' CAT applications, as it held that they had not satisfied the standard for CAT relief "in light of the Colombian government's active opposition to the FARC, and in light of the hypothetical nature of their claim that FARC would act upon its verbal threats by inflicting harm that would rise to the level of torture." Id. at 3. The absence of that governmental consent or acquiescence foreclosed any possibility that the IJ or the BIA could grant petitioners relief on their CAT

4

applications. See 8 C.F.R. § 1208.18(a)(1). Thus, the BIA indicated that petitioners failed to establish that, if they returned to Colombia, it was more likely than not that they would be tortured as the CAT defines and applies that term in withholding of removal proceedings. Finally, the BIA rejected petitioners' due process of law argument that the proceedings before the IJ had been fundamentally unfair. Petitioners now seek review of the BIA's decision.

## II. JURISDICTION, STANDARD of REVIEW, and APPLICABLE LAW

We have jurisdiction over the petition for review pursuant to 8 U.S.C. §§ 1252(a)(1) and 1252(b)(2). We review the BIA's factual determinations, including its conclusions regarding the lack of evidence of persecution, for substantial evidence, see Chavarria v. Gonzalez, 446 F.3d 508, 515 (3d Cir. 2006), and must uphold the determinations "unless the evidence not only supports a contrary conclusion, but compels it." Abdille v. Ashcroft, 242 F.3d 477, 484 (3d Cir. 2001); see 8 U.S.C. § 1252(b)(4)(B). In this case inasmuch as the BIA affirmed the IJ's decision and order, largely but not entirely for the reasons in her decision, we review the decisions of both the IJ and the BIA. See Kaita v. Att'y Gen., 522 F.3d 288, 295-96 (3d Cir. 2008); Chavarria, 446 F.3d at 515. We, however, review petitioners' constitutional arguments de novo. See Yusupov v. Att'y Gen., 518 F.3d 185, 197 (3d Cir. 2008); Ezeagwuna v. Ashcroft, 325 F.3d 396, 405 (3d Cir. 2003).

An alien seeking withholding of removal must demonstrate a clear probability that

5

if he returns to the country to which his removal is proposed, i.e., the country of removal, he will be persecuted, meaning that it is more likely than not that his life or freedom would be threatened and that the threat would be attributable to his race, religion, nationality, membership in a particular social group, or political opinion. See 8 U.S.C. § 1231(b)(3)(A); Tarrawally v. Ashcroft, 338 F.3d 180, 186 (3d Cir. 2003). In this case the IJ designated Colombia as the country of removal. If an alien can establish that he suffered past persecution in the country of removal, there is a rebuttable presumption that he will be subjected to future persecution if removed to that country. But even if an alien has not suffered past persecution in the country of removal, if the alien can establish through other evidence that there is a likelihood that he will be subject to future persecution in the country of removal he will be eligible for withholding of removal relief. See 8 C.F.R. § 1208.16(b). Persecution includes "threats to life, confinement, torture, and economic restrictions so severe that they constitute a threat to life or freedom," but "does not encompass all treatment that our society regards as unfair, unjust, or even unlawful or unconstitutional." Fatin v. INS, 12 F.3d 1233, 1240 (3d Cir. 1993).

The persecution standard in withholding of removal cases is not easily satisfied, particularly when the application for withholding of removal is predicated, as is the case here, on mere threats because "unfulfilled threats must be of a highly imminent and menacing nature in order to constitute persecution." Li v. Att'y Gen., 400 F.3d 157, 164

6

(3d Cir. 2005). The need for this exacting standard is justified because without it an alien could obtain relief essentially on the basis of nothing more than his recounting of conversations in which he engaged. Thus, "threats standing alone . . . constitute persecution in only a small category of cases" and only if they "are so menacing as to cause significant actual suffering or harm." Id. (internal quotation marks and citation omitted). To obtain relief under the CAT, an alien must establish that it is more likely than not that he will be tortured in the country of removal with, as we have explained, the consent or acquiescence of a person acting in an official capacity which can include willful blindness to the alien's torture. See 8 C.F.R. § 1208.16(c)(2); 8 C.F.R. § 1208.18(a)(1); Silva-Rengifo v. Atty' Gen., 473 F.3d 58, 65 (3d Cir. 2007).

### III. DISCUSSION

After considering the exacting standards for obtaining withholding of removal and CAT relief, the record in this case, and our standard of review, we see no basis for concluding that the IJ erred in her decision denying petitioners' applications for either withholding of removal or relief under the CAT or that the BIA erred in affirming her decision and order denying their applications. The record shows that after FARC members visited Rigoberto's office in Andes in 1992, he continued to work in the same office for another year without incident before he went to Medellin. Although Rigoberto received periodic threatening phone calls from FARC over a six-year period while he was living in Medellin, those threats, like the threatening phone calls that FARC made to

7

Girlesa in 1999, were not accompanied by acts and the calls were not so sufficiently imminent or menacing that we regard ourselves as compelled to view them as having risen to the level of persecution.

Moreover, we see no basis to conclude that the threats caused actual suffering or harm to either petitioner. In this regard, it is significant that neither petitioner claims in their brief to have suffered any physical consequences from the threats which sometimes results when a person is subject to stress. For example, neither petitioner contends that the stress of the FARC threats required him or her to seek medical treatment or medicine to deal with the stress. Furthermore, FARC did not harm Rigoberto during his brief return to Colombia in 2003,[2] and petitioners' parents and two other siblings have lived in Colombia for many years without incident. Accordingly, neither petitioner has shown that the evidence compels a finding that he or she has been subject to past persecution or is likely to suffer future persecution if he or she returns to Colombia. Finally, we find no basis to hold that the record compels or even could support a finding that either petitioner likely would be tortured if he or she returned to Colombia so as to justify the granting of CAT relief, particularly when the public official consent or acquiescence aspect needed for that relief is considered.

Even if we believed that to the extent petitioners are seeking withholding of

---

[2] The parties' briefs do not explain whether FARC was aware that Rigoberto returned to Medellin for the 25-day period.

removal the record might have justified a conclusion that Rigoberto had been subject to past persecution, our result would not be different.[3] After all, the requirement that we exercise a highly deferential standard of review in removal cases makes it inevitable that there will be cases in which we would deny a petition for review of a BIA decision whether the decision granted or denied relief, see INS v. Elias-Zacarias, 502 U.S. 478, 481 n.1., 112 S.Ct. 812, 815 n.1 (1992), or whether we would have decided the case differently on de novo review. In this case petitioners must rely on the FARC members single visit to Rigoberto more than a decade before and telephone calls to both petitioners to demonstrate that they have been subject to past persecution. That evidence surely does not compel us to reach a conclusion that they were subject to persecution in Colombia, particularly inasmuch as Rigoberto remained in Andes for a year after the FARC visit and he does not claim that during that time FARC harmed him.

Although petitioners have not cited Espinosa-Cortez v. Attorney General, 607 F.3d 101 (3d Cir. 2010), in their comprehensive brief, we have considered that case as some of the facts there are similar to the facts in this case. In Espinosa-Cortez FARC persecuted the lead petitioner, Marco Tulio Espinosa-Cortez, by making threats against him and kidnapping him, though the motive for the kidnapping was initially economic, not political. Espinosa-Cortez was a prominent businessman with extensive business and

---

[3]Clearly, though the record does not compel us to grant either petitioner relief, Rigoberto's claim to have suffered persecution is stronger than Girlesa's.

personal relationships with military and governmental figures attributable to his business activities with the Colombian government that afforded him ongoing access to government facilities. FARC, possibly in view of that access, sought to recruit him as an informant. The threats in Espinosa-Cortez were quite extensive and included FARC's interception of Espinosa-Cortez's daughter on the street on her way from school to make threats to her. After our analysis of the record in Espinosa-Cortez we concluded that the various circumstances that we listed in our opinion demonstrated that "the BIA's conclusion that the FARC's threats were not motivated by a political opinion the guerrillas imputed to Espinosa-Cortez is not supported by substantial evidence in the record." Id. at 114.

The Bedoyas' case, however, materially differs from the petitioners' case in Espinosa-Cortez. First of all, FARC's threats in Espinosa-Cortez were more extensive than its threats here, were escalating, and clearly demonstrated that FARC had the capacity to carry out the threats against Espinosa-Cortez's family. Moreover, Rigoberto was certainly not a target of the prominence of Espinosa-Cortez, the lead petitioner in Espinosa-Cortez. To the contrary, Rigoberto's relatively obscure police position in an isolated rural area causes us to question whether, in view of his long absence from Colombia, FARC will be aware if he returns to Colombia or, if he does return, whether it would have any interest in him.[4] Furthermore, petitioners do not contend that FARC

---

[4] Except for the 25-day period in 2003 Rigoberto has not been in Colombia since 1999.

made a demand that Rigoberto become an informant. Rather, FARC demanded that he resign his police position and leave Andes, and when Rigoberto resigned his police position, left Andes, and moved to Medellin he complied with FARC's demand. Of course, if FARC would have no interest in him or be aware of his presence in Colombia if he returns there, then even if he had been subject to past persecution from FARC in Colombia, the presumption that if he returns to that country that he will be subject to future persecution would be rebutted.

In addition to being distinguishable on the facts, this case and Espinosa-Cortez differ for another quite fundamental reason. In Espinosa-Cortez we essentially assumed without real discussion that FARC's activities constituted persecution of the petitioners. Instead, we focused on the issue of whether the persecution was motivated by political opinion FARC imputed to Espinosa-Cortez. But in this case the IJ explained that even if petitioners' testimony was credible, "they have failed to establish that they have been the victims of past persecution in Colombia or that they have a well-founded fear of future persecution upon their return." App. at 19. The IJ then followed up that conclusion by making a convincing detailed analysis of the evidence. The BIA, on appeal, held that petitioners "have not established a clear probability of persecution in Colombia. The threats against them, which were unfulfilled, did not constitute past persecution." App. at 2 (citation omitted). Accordingly, Espinosa-Cortez and this case addressed fundamentally different issues.

11

In considering Rigoberto's change in circumstances occasioned by his long absence from Colombia, we recognize that in Kaita we indicated, citing 8 C.F.R. § 1208.16(b)(1)(i)(A), that the presumption that there will be future persecution if there was past persecution can be rebutted "if there has been a fundamental change in circumstances in the country of origin . . . ." Kaita, 522 F.3d at 296. But 8 C.F.R. § 1208.16(b)(1)(i)(A) provides more broadly that the presumption may be rebutted if an IJ finds by a preponderance of the evidence that "[t]here has been a fundamental change in circumstances such that the applicant's life or freedom would not be threatened on account" of any of the grounds for withholding of removal and does not limit the change in circumstances to a change in conditions in the country of origin. In view of the provisions of 8 C.F.R. § 1208.16(b)(1)(i)(A) we do not read Kaita to hold that changes in personal circumstances of the alien seeking withholding of removal cannot be adequate to rebut the presumption attributable to an alien's past persecution. Accordingly, we believe that Kaita wrote about a change in circumstances in the country of origin because that was the type of change in circumstances possibly in issue in that case. 522 F.3d at 301.

The final issue that we consider is petitioners' due process argument, the first prong of which is that the IJ violated their due process rights by "aggressively [taking] control of the questioning of [Rigoberto] during the [m]erits [h]earing," thereby preventing them from fully presenting their case. Petitioners' br. at 32. We are not persuaded by this argument because the transcript of the hearing before the IJ leads us to

12

agree with the BIA that "the [IJ's] questioning of [Rigoberto] at the removal hearing appears to have been solely for the legitimate purpose of creating a clear record." App. at 3. Moreover, petitioners have not identified any evidence that they were unable to present at the hearing to support their case, and they otherwise have not shown that the outcome of their case would have been different if the IJ had conducted the hearing in a different way. See Singh v. Gonzales, 432 F.3d 533, 541 (3d Cir. 2006) (stating that an alien must show "substantial prejudice" to prevail on a due process claim).

The record similarly does not support the second prong of petitioners' due process argument, i.e., that the IJ violated their due process rights by making "inaccurate findings." Petitioner's br. at 31. In addressing this issue, we merely need cite Abdulai v. Ashcroft, 239 F.3d 542, 550 (3d Cir. 2001), in which we explained that "the question for due process purposes is not whether the [agency] reached the correct decision; rather, it is simply whether the [agency] made an individualized determination of [the alien's] interests . . . ." (emphasis in original). Clearly, if an original adjudicator commits a constitutional violation by making erroneous findings, then every case on appeal, regardless of the type of proceedings involved, challenging the outcome of the proceeding being reviewed where the original adjudicator based the result on factual findings, would become a constitutional case. We will not adopt that view of the law.

For the foregoing reasons, we will deny the petition for review.

FUENTES, *Circuit Judge*, Concurring.

This is a close case, but, in light of the substantial evidence standard of review, I ultimately conclude that the record does not compel a grant of the petitions.

I.

Because the key to this case is context, I first review the facts of this case, as presented in the Bedoyas' testimony.[1] Rigoberto served as a member of the Colombian national police force tasked with investigating, among other things, crimes committed by FARC. In 1983, he began his service as secretary for police inspections at the Andes police station, overseeing six uniformed policemen. After a bombing and death threats, Bedoya's colleagues abandoned their posts. By 1992, he was the only police officer in the town, serving as its inspector of police. Alone on the front lines of a four-decades long conflict between the Colombian government and paramilitary groups, Bedoya came to suspect that an uncle and a cousin were murdered by FARC. When he investigated their deaths, armed members of that group retaliated by walking into the police station and threatening to murder him. Bedoya reported the threat to the mayor and the Colombian government sent military forces to the area for a short period of time. Bedoya remained for another year, but eventually left when he heard rumors that FARC guerillas were going to carry out their threat.

---

[1] The IJ assumed, for the sake of argument, that the facts were as stated in the Bedoyas' testimony and concluded as a matter of law that the evidence did not establish past persecution. App. at 19. Like the IJ, I assume that the facts presented in the Bedoyas' testimony are true.

1

Bedoya and his family moved to the city of Medellin in 1993, but moving did not make them feel safe. FARC continued to haunt Bedoya, calling and threatening to kill him unless he paid them money. For several years, Bedoya refused to give in to FARC's demands or leave yet another home. Eventually, he fled to the United States. After he left, FARC began to terrorize his sister, Girlesa. She testified that, after Rigoberto's departure, FARC called and threatened to kill her unless she told them his location. She, too, finally decided that the threats were serious and followed her brother to the United States.

Rigoberto testified that he always intended to go back to Colombia once it was safe. However, in 1999 another of his uncles was murdered. According to Rigoberto, FARC committed the crime because of Rigoberto's association with the Colombian police force. In 2003, Rigoberto returned to Colombia for 25 days to determine for himself whether it was safe to return with his family. His relatives told him it was not. Rigoberto investigated further and discovered that several of his former colleagues in the Colombian national police had been assassinated by FARC. Ultimately, he concluded that Colombia was not safe and returned to the United States.

Bedoya's decision to flee Colombia is reminiscent of the facts in *Espinosa-Cortez v. Attorney General*, 607 F.3d 101 (3d Cir. 2010). As the Majority explains, the petitioner in that case was a wealthy businessman with ties to high-ranking members of the Colombian government and military who was threatened by FARC with death unless he agreed to betray his country. Bedoya's case is different from Espinosa-Cortez's, but the differences are largely ones of class and status. Bedoya, like Espinosa-Cortez, was

2

associated with the Colombian government and would not have come to FARC's attention but for his position as a police inspector; and Bedoya, like Espinosa-Cortez, had members of his family threatened. A major difference is that some of Bedoya's friends and family were murdered by members of FARC.

While it is an extremely close call, I ultimately agree with my colleagues that Espinosa-Cortez had a stronger case. The evidence in *Espinosa-Cortez* compelled us to grant the petition: Espinosa-Cortez was specifically targeted by FARC for recruitment, the threats were extensive, and FARC manifested its clear intent to carry out those threats when it intercepted Espinosa-Cortez's daughter on her way home from school. The evidence in Bedoya's case is not as compelling: he was not targeted for recruitment, the threats against him were more sporadic, and after the threats were issued, there was no further conduct demonstrating that the threats were "highly imminent and menacing." *See Li v. Att'y Gen.*, 400 F.3d 157, 164 (3d Cir. 2005).

In short, despite some misgivings, I conclude that there is substantial evidence in the record to support the BIA's decision.

## II.

I do disagree with the Majority on two points. In my view, it is incorrect to imply that aliens claiming persecution on account of threats cannot obtain withholding of removal unless the harm caused by the threats manifests itself in a physical ailment requiring medical attention. After all, if physical harm is required before a threat constitutes persecution, Espinosa-Cortez's petition would not have been granted. Here, the BIA stated that "the threats against [petitioners], *which were unfulfilled*, did not

3

constitute past persecution." App. at 2 (emphasis added). I cannot imagine that the BIA meant that the threat to kill had to be fulfilled before it could amount to persecution.

Second, the Majority implies that even if the threats to the Bedoyas constituted past persecution, any resulting presumption of future persecution is adequately rebutted by changes in Rigoberto's personal circumstances since he left Colombia. I do not think this is an appropriate factor to consider in evaluating withholding of removal because improvement in personal circumstances will almost always be the case when an immigrant flees persecution.

III.

In light of the highly deferential standard of review in this case, I concur in the judgment on the ground that there is substantial evidence.

4