**PRECEDENTIAL**

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 08-4170
_____

MARCO TULIO ESPINOSA-CORTEZ,
LUZ MARINO LOPEZ-TIBADUIZA, &
XIMENA DEL PILAR ESPINOSA-LOPEZ,

Petitioners

v.

ATTORNEY GENERAL OF THE UNITED STATES,

Respondent

On Petition for Review of an Order
of the Board of Immigration Appeals

(Agency Case Numbers A98-542-368,
A98-542-369, A98-543-097)

Argued March 24, 2010

Before: RENDELL, AMBRO, and FUENTES, Circuit Judges

(Opinion Filed: June 2, 2010)

Peter M. Rogers, Esq. [ARGUED]
Rogers & Rogers, P.C.
437 Grand Street
Suite 1806
Pittsburgh, PA 15219

      Counsel for Petitioners

Dalin R. Holyoak, Esq. [ARGUED]
Kristen Giuffreda Chapman, Esq.
Regina Byrd, Esq.
Francis W. Fraser, I, Esq.
United States Department of Justice
Office of Immigration Litigation, Civil Division
P.O. Box 878
Ben Franklin Station
Washington, DC 20044

      Counsel for Respondent

---

OPINION OF THE COURT

---

FUENTES, Circuit Judge:

-2-

Marco Tulio Espinosa-Cortez, his wife, Luz, and his adult daughter, Ximena, are natives and citizens of Colombia. Between 2002 and 2003, the Espinosa-Cortez family was repeatedly threatened by agents of the Fuerzas Armadas Revolucionarias de Colombia ("FARC") in an effort to coerce Espinosa-Cortez, who had close connections to the Colombian government and military, into becoming a FARC informant. Once it became clear that the Colombian government would not take steps to protect his family, Espinosa-Cortez liquidated his assets, fled with his family to the United States, and applied for asylum, withholding of removal, and relief under the Convention Against Torture ("CAT"). The immigration judge ("IJ") denied his application, and the Board of Immigration Appeals ("BIA") affirmed, concluding that Espinosa-Cortez had not shown that he would be persecuted on account of actual or imputed political beliefs if he were removed to Colombia.

Espinosa-Cortez seeks review on one issue—whether substantial evidence supports the BIA's conclusion that Espinosa-Cortez lacks a reasonable fear that he would be persecuted on account of his actual or imputed political beliefs if he were to return to Colombia.[1] Although we review the

---

[1] There are two petitions under review in this matter—that of Espinosa-Cortez (which includes his wife as a derivative claimant) and that of his adult daughter, Ximena. The petitions arise out of the same set of facts, which center around Espinosa-Cortez's social and business activities and his connections to the Colombian military and government. For the sake of simplicity, we refer to Petitioners collectively as

-3-

BIA's decision under a highly deferential standard, we conclude that the BIA's decision is not supported by substantial evidence, and we will grant the petition for review.

## I.

## A.

We begin by reviewing Espinosa-Cortez's testimony. We note at the outset that the IJ found the majority of Espinosa-Cortez's testimony credible, and unless otherwise noted, the testimony we review below was found credible.

Espinosa-Cortez's troubles with the FARC trace back to 1984, when a vehicle he was driving was ambushed and he was kidnapped. Espinosa-Cortez was held captive by the FARC for approximately one month until a ransom was paid to secure his release. Espinosa-Cortez conceded during his testimony that the 1984 kidnapping was motivated by his wealth, not his political beliefs; indeed, he was not politically active in any meaningful way in 1984. After the kidnapping, however, and as a result of his dislike for the FARC, he became increasingly active in Liberal Party politics, giving money to various Liberal Party candidates and participating in a variety of political campaigns. According to Espinosa-Cortez's testimony, these campaigns would frequently receive generalized threats from the FARC, although he personally received no direct threats from the FARC while participating in the campaigns. Espinosa-Cortez did not testify in significant detail as to his participation in Liberal Party

"Espinosa-Cortez," except where it is necessary to identify them individually.

-4-

politics, mentioning it only in passing during his direct testimony. The IJ did not find his testimony concerning "the degree of his political activity" to be credible in light of the fact that he "mentioned his political participation only incidentally." (App. at 75.)

In addition to his direct participation in political campaigns, Espinosa-Cortez had wide-ranging connections with the Colombian military and government as a result of his social and business activities. Espinosa-Cortez had long participated in equestrian events in Colombia and was a member of the Federal Equestrian Board; Espinosa-Cortez testified that he and his wife would attend equestrian events every weekend, where they would socialize with government ministers and high-ranking military personnel.

More importantly for purposes of Petitioners' asylum claims, Espinosa-Cortez also developed relationships with governmental and military figures through his business activities. In particular, Espinosa-Cortez owned a catering business that supplied food to governmental and military institutions, and he owned a store within the military academy that sold food to cadets. Through his work as a food supplier, Espinosa-Cortez, his family, and his employees had "free access" to the military academy at all hours, (App. at 138); that is, as a food supplier to government and military institutions, Espinosa-Cortez and his family had ready access to, and frequently worked in, those institutions.

Between 2002 and 2003, Espinosa-Cortez received a

series of threatening telephone calls from the FARC.[2] When he received the first such call, he thought that the caller was playing a prank on him, but the FARC agent informed him that he was not joking and that the FARC wanted his help. The caller promised to get back in touch with him and hung up. In November 2002, the FARC agent called back and demanded, first, that Espinosa-Cortez act as an informant for the FARC and, second, that he cease providing food and other services to the army. The caller stated that Espinosa-Cortez's wife and daughter would be killed if he did not assist the FARC; the caller described Ximena's daily routine in detail, implying that the FARC had been following her. Although the translation or transcription of Espinosa-Cortez's testimony on this point could be clearer,[3] it is evident that Espinosa-Cortez rejected the FARC's demands in no uncertain terms:

> They wanted me, me to be an informant. And that we stop providing for the army and work with them and they needed—that they wanted part of

---

[2] The IJ expressly stated that she found Espinosa-Cortez's testimony "with respect to the FARC's pursuit of him to become their informant" to be credible. (App. at 74.)

[3] The transcript of the immigration proceedings is replete with errors, and numerous words of the testimony are simply labeled "indiscernible." Petitioners complained during the proceedings that Espinosa-Cortez's testimony was being poorly translated, and they raised this issue (as well as a concern over the inadequacy of the transcript) on appeal before the BIA, but they do not raise it here.

the money that I had, that I made. <u>They just stated that no moment would I accept because they go against my principles</u>. At, at no time because with the experience that I had my hatred of them was complete and I, I wanted them to be enemies.

(<u>Id.</u> at 138 (emphasis added.))[4]

Prior to the November 2002 telephone call, Espinosa-Cortez had informed neither his wife nor the police of the prior threats. After that call, however, he "went into a panic" and informed his wife of the telephone calls. (<u>Id.</u> at 134.) He also spoke to his friends in the military, who advised him that there was nothing to be done and that he should change his daily routine. In December 2002, he found on the windshield of his car a drawing of the route he took when driving to the military academy, which he understood to be an indication of the fact that he was being followed by the FARC. At this point,

---

[4] The underlined portion of the testimony quoted here appears to contain an error in translation or transcription, in that the first word clearly should be "I," not "they." It makes little sense for the FARC to have informed Espinosa-Cortez that he would not inform for them because they go against his principles—obviously, Espinosa-Cortez said this to the caller, not the reverse. This reading is supported by the next sentence, which explains why "at no time" would Espinosa inform for the FARC. As we explain below, however, whether or not this portion of Espinosa-Cortez's testimony was mistranslated is immaterial to our analysis.

Espinosa-Cortez went to the military unit called Grupos de Acción Unificada por la Libertad Personal ("GAULA"), which is a specialized anti-kidnapping unit of the Colombian military. GAULA informed him that cases older than his took priority and that, in effect, nothing could be done to protect him or his family.

In February 2003, Espinosa-Cortez received a final call from the FARC in which the caller demanded that he work as an informant and "cooperate with them in every sense." (Id. at 136.) Subsequently, in May 2003, two well-dressed men approached Ximena on the street on her way home from school. The men told her to relay the message to her father that they were "not playing." (Id. at 156.) Alarmed by the fact that the FARC had escalated from making telephone calls to Espinosa-Cortez to making personal contact with Ximena, the family decided that they had to leave Colombia. They quickly liquidated their assets and flew to the United States, the only country where the three already had tourist visas.

**B.**

Shortly after their arrival in the United States, Espinosa-Cortez and Ximena filed separate petitions for asylum, withholding of removal, and CAT relief; Espinosa-Cortez's application was filed on behalf of himself and his wife. The hearings on the two petitions were consolidated, as the factual basis for Ximena's application is identical to that underlying her parents' application.

The IJ denied the applications. As we noted, supra, the IJ found that Espinosa-Cortez's testimony concerning the FARC's pursuit of him to become their informant was credible,

but she did not find his testimony concerning his Liberal Party campaign activities to be credible. The IJ concluded that Espinosa-Cortez's treatment by the FARC did not amount to past persecution on account of his political opinions, because (1) the 1984 kidnapping was motivated by money, not politics; and (2) the FARC's threats were not sufficiently imminent to constitute persecution.

The IJ further concluded that Petitioners had not demonstrated that they have a well-founded fear of future persecution on account of Espinosa-Cortez's actual or imputed political beliefs. The IJ observed that the FARC seeks to destabilize the country as a whole—she noted that "everyone from the president on down is under threat from FARC," (id. at 76)—and that generalized civil unrest does not constitute persecution. With regard to the threats that were levied at Petitioners in particular, the IJ concluded that there was no nexus between these threats and Espinosa-Cortez's actual or imputed political beliefs because "respondent's own political activity is very scanty." (Id. at 77.) Instead, the IJ concluded that Espinosa-Cortez had been threatened because of his social and professional ties to the government, not his political beliefs:

> Almost all the evidence reflects [that] FARC's motivation to recruit respondent as an informant was based on his commercial and social ties to police, military and government officials, and his access to these groups through his catering business. FARC does view the respondent as potentially useful to their goal, but did not deem him politically offensive.

(Id. at 78-79.)  Having found that the persecution Espinosa-Cortez faced was not on account of his political beliefs, the IJ concluded that he was ineligible for asylum.[5]

Espinosa-Cortez appealed the IJ's ruling to the BIA, which affirmed.  The BIA reasoned as follows:

> [T]he respondent did not demonstrate that the FARC was motivated to threaten him by any political opinion imputed to him or because of his prior support and participation in mayoral campaigns on behalf of the Liberal Party.  The respondent did not adequately show that his political opinion played any significant role in his business connections with the military.  Nor did he sufficiently show that the FARC would view him as a political supporter of the government if he did not serve as an informant . . . . Thus, while the lead respondent claims that the FARC attributed a political opinion to him based on his strong connections with the Colombian government and that his refusal to cooperate was perceived as an intention to support the

_____

[5] Since an applicant's burden of proof for withholding of removal is higher than that for asylum, the IJ determined that the Petitioners were ineligible for withholding of removal.  The IJ likewise denied their applications for relief under the CAT, since it was not the Colombian government that threatened to harm Petitioners.  Espinosa-Cortez does not appeal these two rulings.

-10-

government, the evidence of record does not adequately support his claim. See I.N.S. v. Elias-Zacarias, 502 U.S. 478, 482 (1992).

(App. at 3.) The BIA likewise affirmed the IJ's denial of Espinosa-Cortez's application for withholding of removal and CAT relief, see Note 5, supra, and rejected Espinosa-Cortez's argument that inadequate translation and transcription affected the fairness of the proceedings, see Note 3, supra. Espinosa-Cortez thereafter filed this timely petition for review of the BIA's decision.

## II.

## A.

We have jurisdiction to review a final order of removal under 8 U.S.C. § 1252(a)(1). "Because the BIA issued an opinion, rather than a summary affirmance, we review the BIA's (rather than the IJ's) decision." Rranci v. Att'y Gen., 540 F.3d 165, 171 (3d Cir. 2008) (citing Li v. Att'y Gen., 400 F.3d 157, 162 (3d Cir. 2005)).

Our review of the BIA's denial of Petitioners' asylum application is highly deferential. "We affirm any findings of fact supported by substantial evidence and are 'bound by the administrative findings of fact unless a reasonable adjudicator would be compelled to arrive at a contrary conclusion.'" Camara v. Att'y Gen., 580 F.3d 196, 201 (3d Cir. 2009) (quoting Yan Lan Wu v. Ashcroft, 393 F.3d 418, 421 (3d Cir. 2005)); see also 8 U.S.C. § 1252(b)(4)(B) ("[T]he administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary."). Whether, for

-11-

asylum purposes, a petitioner has proven that he or she has a well-founded fear of persecution "is a question of fact, and the agency determination must be upheld if it is supported by 'substantial evidence' in the record." Gomez-Zuluaga v. Att'y Gen., 527 F.3d 330, 340 (3d Cir. 2008) (quoting Lukwago v. Ashcroft, 329 F.3d 157, 167 (3d Cir. 2003)). We have, however, emphasized that "the requirement that the BIA's decision be supported by substantial evidence is not an empty one." Chavarria v. Gonzalez, 446 F.3d 508, 517 (3d Cir. 2006). "[D]eference is not due where findings and conclusions are based on inferences or presumptions that are not reasonably grounded in the record, viewed as a whole," Valdiviezo-Galdamez v. Att'y Gen., 502 F.3d 285, 290 (3d Cir. 2007) (citation omitted), and the BIA is not permitted simply to ignore or misconstrue evidence in the asylum applicant's favor. See, e.g., Chavarria, 446 F.3d at 519; BinRashed v. Gonzales, 502 F.3d 666, 673 (7th Cir. 2007).

**B.**

Espinosa-Cortez contends that the BIA's decision that he lacked a reasonable fear of future persecution on account of his actual or imputed political beliefs is not supported by substantial evidence in the record. In particular, he argues that the BIA employed too narrow an understanding of what constitutes a political opinion, and that the BIA overlooked the significance of his close ties to the Colombian government in concluding that he had not been targeted because of an imputed political opinion. We review the law that governs Espinosa-Cortez's asylum claim and address the merits of his petition for review in turn below.

-12-

1.

"The Attorney General has the discretion to grant asylum to any alien who 'is a refugee within the meaning of section 1101(a)(42)(A)'" of the Immigration and Nationality Act ("INA"). Camara, 580 F.3d at 201 (quoting 8 U.S.C. § 1158(b)(1)(A)). The INA defines the term "refugee" as follows:

> [A]ny person who is outside any country of such person's nationality . . . and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.

8 U.S.C. § 1101(a)(42)(A).

Under the terms of this provision, Espinosa-Cortez may show that he is eligible for asylum by proving either that he was previously persecuted on account of a statutorily enumerated ground, or that he has a well-founded fear of future persecution on account of a statutorily enumerated ground. Persecution "includes, but is not limited to, 'threats to life, confinement, torture, and economic restrictions so severe that they constitute a threat to life or freedom.'" Gomez-Zuluaga, 527 F.3d at 340 (quoting Yu v. Att'y Gen., 513 F.3d 346, 348 (3d Cir. 2008)). An asylum applicant who establishes that he or she was previously persecuted on account of a statutorily enumerated ground triggers a rebuttable presumption that the applicant has a well-founded fear of future persecution. See Lukwago, 329 F.3d at 174 (citation omitted).

-13-

An asylum applicant who cannot establish past persecution does not enjoy the benefit of such a presumption but may still demonstrate eligibility for asylum by establishing that he or she has a well-founded fear of future persecution. In order to show that a fear of future persecution is "well-founded," 8 U.S.C. § 1101(a)(42)(A), a petitioner must demonstrate that his or her "fear is both subjective[ly] and objectively reasonable, which [he or] she may do by using testimonial, documentary, or expert evidence." Gomez-Zuluaga, 527 F.3d at 346 (internal citations omitted). In order to satisfy the subjective prong of this inquiry, the petitioner must show "that the fear is genuine." Zubeda v. Ashcroft, 333 F.3d 463, 469 (3d Cir. 2003) (citation omitted). To satisfy the objective prong, the petitioner must show that "a reasonable person in the alien's circumstances would fear persecution if returned to the country in question." Id. (citation omitted).

However, "an applicant for asylum need not prove that the persecution he or she suffered (or fears suffering in the future) occurred solely on account [of] one of the five grounds enumerated in the INA." Singh v. Gonzales, 406 F.3d 191, 197 (3d Cir. 2005) (citation omitted). Rather, the applicant must only demonstrate that the protected ground constitutes "at least one central reason for persecuting the applicant." 8 U.S.C. § 1108(b)(1)(B)(I). The asylum applicant bears the burden of proving eligibility for asylum, and "[t]estimony, by itself, is sufficient to meet this burden, if credible." Singh, 406 F.3d at 195 (quotation marks and citations omitted).

2.

Turning to the merits of the instant petition for review,

-14-

we conclude that the BIA's determination that the FARC did not target Espinosa-Cortez on account of a political opinion it imputed to him is not supported by substantial evidence in the record. We have long recognized that a person can be eligible for asylum if he faces the prospect of persecution on account of imputed, as well as actual, political beliefs. See, e.g., Lukwago, 329 F.3d at 181 ("[P]ersecution may be on account of a political opinion the applicant actually holds or on account of one the [persecutor] has imputed to him.") (citation omitted). The majority of our sister circuits have likewise held that "an alien may base a persecution claim on imputed political opinion."[6] Chen v. Holder, --- F.3d ----, 2010 WL 1688491, at *5 (7th Cir. Apr. 28, 2010); accord Haider v. Holder, 595 F.3d 276, 285 (6th Cir. 2010); Marroquin-Ochoma v. Holder, 574 F.3d 574, 577 (8th Cir. 2009); Singh v. Mukasey, 543 F.3d 1, 6 (1st Cir. 2008); Delgado v. Mukasey, 508 F.3d 702, 706 (2d Cir. 2007); Rivera v. U.S. Att'y Gen., 487 F.3d 815, 820 (11th Cir. 2007); Cordon-Garcia v. I.N.S., 204 F.3d 985, 991-92 (9th Cir. 2000).

In determining whether an asylum applicant was persecuted because of an imputed political opinion, we focus on whether "the persecutor attributed a political opinion to the victim, and acted upon the attribution." Amanfi v. Ashcroft, 328 F.3d 719, 729 n.4 (3d Cir. 2003) (citation omitted). This

---

[6] The General Counsel of the Immigration and Naturalization Service ("INS") recognized as early as 1993 that an imputed political opinion is an acceptable basis for an asylum claim. See INS General Counsel Legal Opinion (January 19, 1993), reprinted in 70 Interpreter Releases 498.

focus on whether the persecutor (or would-be persecutor) attributes a political view to the victim makes clear that "the INA 'makes motive critical' and an asylum applicant must provide 'some evidence of [motive], direct or circumstantial.'" Gomez-Zuluaga, 527 F.3d at 343 (quoting Elias-Zacarias, 502 U.S. at 483). Although cognizant of this emphasis upon a persecutor's motive, the Courts of Appeals have at the same time recognized that "it would be patently absurd to expect an applicant . . . to produce [] documentary evidence" of a persecutor's motives, Chavarria, 446 F.3d at 521 (quotation marks and citations omitted), since "persecutors are hardly likely to submit declarations explaining exactly what motivated them to act." Parussimova v. Mukasey, 555 F.3d 734, 742 (9th Cir. 2009) (quotation marks and citation omitted). Accordingly, in certain cases, "the factual circumstances alone may constitute sufficient circumstantial evidence of a persecutor's . . . motives." Canales-Vargas v. Gonzales, 441 F.3d 739, 744 (9th Cir. 2006) (further explaining that "circumstantial evidence of motive may include, inter alia, the timing of the persecution and signs or emblems left at the site of persecution") (quotation marks and citations omitted); see also Chavarria, 446 F.3d at 521.

In finding that Espinosa-Cortez failed to establish that FARC's motives for pursuing him related to actual or imputed political beliefs, the BIA relied almost exclusively upon the Supreme Court's decision in Elias-Zacarias; in defending the BIA's decision, the Government likewise rests heavily upon Elias-Zacarias. Owing to its importance in this case, therefore, a detailed review of that decision is in order.

In Elias-Zacarias, the petitioner was a young man from

Guatemala who was approached by guerrillas and urged to join their movement. 502 U.S. at 479. The petitioner resisted this attempt at recruitment because, according to his testimony, "the guerrillas are against the government and he was afraid that the government would retaliate against him and his family if he did join the guerrillas." Id. at 480. The IJ and the BIA concluded that the guerrillas' attempted recruitment did not constitute persecution on account of the petitioner's political beliefs, but the Ninth Circuit "ruled that acts of conscription by a nongovernmental group constitute persecution on account of political opinion, and determined that Elias-Zacarias had a 'well-founded fear' of such conscription." Id.

The Supreme Court reversed. As the Court explained, Elias-Zacarias had not only failed to demonstrate that he resisted the recruitment efforts on account of his political beliefs, but his testimony revealed just the opposite to be true—that he resisted out of fear of governmental retaliation (which is not a political opinion):

> Even a person who supports a guerrilla movement might resist recruitment for a variety of reasons—fear of combat, a desire to remain with one's family and friends, a desire to earn a better living in civilian life, to mention only a few. The record in the present case not only failed to show a political motive on Elias-Zacarias' part; it showed the opposite. He testified that he refused to join the guerrillas because he was afraid that the government would retaliate against him and his family if he did so. Nor is there any indication (assuming, arguendo, it would suffice) that the

-17-

guerrillas erroneously believed that Elias-Zacarias' refusal was politically based.

Id. at 482. The Court likewise rejected the petitioner's suggestion that the guerrillas would automatically construe his resistance to their recruitment efforts as being political in nature. The Court explained that such resistance could just as easily be explained by "indifference, indecisiveness, and risk averseness," and that Elias-Zacarias had failed to present any evidence "that the guerrillas [would] persecute him because of [his] political opinion, rather than because of his refusal to fight with them." Id. at 483.

The BIA more or less treated Elias-Zacarias as dispositive of Espinosa-Cortez's asylum claim, and the Government urges that we do the same. As the BIA concluded and the Government argues, there are certain obvious similarities between this case and Elias-Zacarias. As in Elias-Zacarias, Espinosa-Cortez was subjected to an effort at recruitment by a guerrilla organization, and, as in our case, the attempted recruitment in Elias-Zacarias was accompanied by threats. See id. at 480. And, as was true in Elias-Zacarias, Espinosa-Cortez produced no direct evidence that the guerrillas targeted him, at least in part, on account of their perception of his political views.[7] Id. at 483. At first blush, then, the

_____

[7] It bears repeating, however, that evidence of the persecutor's motive may be—and, for practical purposes, will necessarily be—circumstantial, not direct. See Chavarria, 446 F.3d at 521 (noting that "persecutors are hardly likely to provide their victims with affidavits attesting to their acts of

-18-

similarities between the two cases lend some support to the BIA's rejection of Espinosa-Cortez's asylum claim.

There are, however, important factual distinctions between Elias-Zacarias and this case that the BIA did not consider. These factual distinctions lead us to conclude that "a reasonable adjudicator would be compelled" to find that the FARC's pursuit of Espinosa-Cortez stemmed, at least in part, from a political opinion it imputed to him. Camara, 580 F.3d at 201 (citation omitted). Elias-Zacarias, in other words, is not dispositive of Espinosa-Cortez's claim, and the BIA overlooked the significance of certain critical facts in the record that clearly distinguish Espinosa-Cortez's case from Elias-Zacarias.

The first such fact is Espinosa-Cortez's close, direct affiliation with, and support of, the Colombian government and military. Quite unlike the record in Elias-Zacarias, in which there was no suggestion whatsoever that the petitioner had any ties to the Guatemalan government, Espinosa-Cortez made his living by supporting the Colombian government, military, and military academy through the provision of food and other services. Although we have not made the point expressly, the Ninth Circuit has long "found persecution of those who work for or with political figures to be on account of the political opinion of their employer even if the nature of their work for or with that person is not in itself political." Navas v. I.N.S., 217 F.3d 646,

persecution") (quotation marks and citations omitted). A petitioner is not required to produce direct evidence of a persecutor's motive, but is instead permitted to rely upon circumstantial evidence. See Elias-Zacarias, 502 U.S. at 483-84.

-19-

659 n.19 (9th Cir. 2000); accord Sagaydak v. Gonzales, 405 F.3d 1035, 1042 (9th Cir. 2005) ("Viktor was aligned with the political opinion of his employer simply by the fact that he worked as a government official enforcing government policies."); Cordon-Garcia, 204 F.3d at 992 (Where a teacher taught literacy classes for a government-funded organization, her "presumed affiliation with the Guatemalan government—an entity the guerrillas oppose—is the functional equivalent of a conclusion that she holds a political opinion opposite to that of the guerrillas, whether or not she actually holds such an opinion.") (quotation marks omitted); Velarde v. INS, 140 F.3d 1305, 1312 (9th Cir. 1998).

Cordon-Garcia is instructive on this point and highly relevant to our case. The petitioner in that case worked for CONALFA, a government-funded literacy agency in Guatemala. Cordon-Garcia, 204 F.3d at 988. She was approached by a guerrilla who, like the FARC agents in our case, informed her "that the guerrillas wanted her to work for them instead of for CONALFA." Id. at 989. The guerrilla informed the petitioner that the guerrillas opposed her literacy work, threatened her, and told her that she would have to "decide which one you're going to work with." Id. The petitioner fled to the United States and applied for asylum; the IJ rejected her asylum claim and the BIA affirmed.

The Ninth Circuit granted the petition for review, holding that Cordon-Garcia had been persecuted on account of a pro-government political opinion that the guerrillas had imputed to her by virtue of her employment with a government-funded organization. As the court explained, "[a]bsent her affiliation with the government and its push for literacy among

-20-

Guatemalans, Petitioner likely would not have come to the guerrillas' attention." Id. at 992. In an analysis that is directly applicable to Espinosa-Cortez's asylum claim, the Court observed that

> Petitioner's "presumed affiliation" with the Guatemalan government—an entity the guerrillas oppose—is the functional equivalent of a conclusion that she holds a political opinion opposite to that of the guerrillas, whether or not she actually holds such an opinion. This is the crux of the idea covered by the doctrine of "imputed political opinion" in refugee and asylum law. Accordingly, we hold that any reasonable factfinder would have to conclude that Petitioner suffered persecution, at least in part, due to this imputed political opinion.
>
> According to the BIA, Petitioner's experiences resulted from "attempted recruitment," "displeasure with the respondent's profession," and nothing more than "the general strategy of the Guatemalan guerrillas to create civil disorder." These descriptions are not borne out by the record in this case. Petitioner plainly suffered this experience specifically because of her affiliation with the government . . . . Each of the BIA's attempts to nullify the political overtones of Petitioner's experiences overlooks both the fact that she was affiliated with the government and the obvious inference that her continued teaching meant opposition to the guerrillas' goals.

-21-

Id. at 992 (internal citations omitted).

We agree with this analysis, and, as was the case in Cordon-Garcia, we believe that a reasonable factfinder would be compelled to conclude that the political opinions that the guerrillas imputed to Espinosa-Cortez were "at least one central reason" for the FARC's threats. 8 U.S.C. § 1108(b)(1)(B)(I). As was true in Cordon-Garcia, Espinosa-Cortez was not directly employed by the Colombian government, but he was closely affiliated with the government, provided support to the government, and he depended upon the government for his livelihood. Id. at 988. And as in Cordon-Garcia, it was exclusively Espinosa-Cortez's affiliation with, and access to, the Colombian government and military that brought him "to the guerrillas' attention" in the first place. Id. at 992. There is absolutely no suggestion from the record that the FARC would have pursued Espinosa-Cortez to become an informant if he had not been so closely associated with the government and military, and, indeed, the entirety of the evidence is to the contrary. To conclude, as the BIA did, that there was "no political link to the FARC's threats," (App. at 3), would require either that one turn a blind eye to the factual circumstances surrounding the FARC's pursuit of Espinosa-Cortez, or that one adopt an impermissibly narrow construction of the term "political opinion." See Delgado v. Mukasey, 508 F.3d 702, 707 (2d Cir. 2007) (being pro-government and anti-FARC is a political opinion for asylum purposes).

Indeed, as Espinosa-Cortez argues, we have determined that the BIA erred in failing to impute political opinions under more tenuous circumstances than those presented in this case. In Chavarria, the petitioner "was essentially apolitical," but,

-22-

acting as a good Samaritan, he came to the aid of two women who were being attacked by government-sponsored paramilitaries in Guatemala. Chavarria, 446 F.3d at 513. The two women, it turns out, were members of CONAVIGUA, an anti-government human rights organization, and the petitioner was subsequently followed and threatened by the paramilitaries who had attacked the women. Id. We held that Chavarria's fear was "clearly on account of an imputed political opinion" and rejected the IJ's and BIA's determinations to the contrary, finding that the agency's conclusions were not supported by substantial evidence. Id. at 521. We explained:

> Here, Chavarria testified that, before the first incident with the CONAVIGUA women, he was essentially apolitical. As we noted earlier, he then offered substantial and compelling testimony that after the incident he was put under surveillance by the same men who perpetrated the attack on the CONAVIGUA women. There is no evidence casting any doubt on this testimony, and we think it clear that the paramilitaries targeted Chavarria because they ascribed to him an association with the CONAVIGUA group that, at minimum, could be anti-government sympathies.

Id. It goes without saying that Espinosa-Cortez's long-term affiliation with, and support of, the Colombian government was much more significant than was Chavarria's fleeting association

with two members of the CONAVIGUA group.[8]  In short, the BIA overlooked the obvious political overtones in the FARC's pursuit of Espinosa-Cortez, who would have been of no interest to the guerrillas but for his long-standing, close association with the Colombian government.  Cordon-Garcia, 204 F.3d at 992.

There are two additional significant facts, overlooked by the IJ and the BIA, that distinguish this case from Elias-Zacarias.  First, unlike the petitioner in Elias-Zacarias, Espinosa-Cortez engaged in protracted resistance to the FARC's recruitment efforts.  In Elias-Zacarias, the petitioner was approached by guerrillas on a single occasion; Elias-Zacarias refused their single effort at recruitment (without, apparently, expressing any political views) and fled to the United States.

---

[8]  Moreover, in suggesting that Espinosa-Cortez was required to "show that his political opinion played [a] significant role in his business connections with the military" in order to prove that the FARC imputed a pro-government, anti-FARC opinion to him, the BIA misstated the premise of an imputed political opinion.  (App. at 3.)  At the root of the concept of persecution on account of imputed political opinion is the fact that "persecution may be on account of a political opinion the applicant actually holds or on account of one the [persecutor] has imputed to him."  Lukwago, 329 F.3d at 181 (citation omitted).  Espinosa-Cortez was not required to prove that his business connections with the government resulted from a political opinion he held in order to show that the FARC imputed a political opinion to him based upon his close ties to the government.  See Cordon-Garcia, 204 F.3d at 992.

See Elias-Zacarias, 502 U.S. at 479-80. By contrast, in this case, the Espinosa-Cortez family was approached by the FARC on multiple occasions, including the occasion in which the FARC agents approached Ximena on the street, and Espinosa-Cortez was repeatedly asked to serve as an informant and to cease providing food to the military. Second (and more importantly), although the translation of his testimony could be clearer, it is apparent that Espinosa-Cortez, unlike Elias-Zacarias, made his anti-FARC views known to his persecutors in rejecting their advances. In describing one of his exchanges with a FARC caller, Espinosa-Cortez testified as follows: "They just stated that no moment would I accept because they go against my principles. At, at no time because with the experience that I had my hatred of them was complete and I, I wanted them to be enemies." (App. at 138.)

There are two possible ways to interpret the first of these sentences: either that Espinosa-Cortez stated directly to his FARC pursuer that he would not inform for them because the FARC went against his principles, or that a member of the FARC stated to Espinosa-Cortez that Espinosa-Cortez would not join the FARC because the FARC went against his principles. Under either interpretation, the significant point is that Espinosa-Cortez's testimony demonstrates unmistakably that the FARC was aware that Espinosa-Cortez's refusal to work for the guerrillas stemmed from his anti-FARC principles. Unlike in Elias-Zacarias, where it was unclear whether the petitioner's resistance to the guerrillas was motivated by political beliefs or "indifference, indecisiveness, and risk averseness," Elias-Zacarias, 502 U.S. at 483, in this case we know (and, more importantly, the FARC knew) that Espinosa-Cortez's resistance

-25-

was motivated at least in part by his anti-FARC sentiment. The guerrillas' continued threats in the face of Espinosa-Cortez's stated opposition to the FARC demonstrate a close nexus between the FARC's threats and Espinosa-Cortez's political opinions that was absent in Elias-Zacarias.

In this respect, even if the BIA concluded that Espinosa-Cortez was not initially targeted on account of imputed political beliefs (a conclusion that, as we noted above, is undermined by the principles of Cordon-Garcia), he was eventually threatened, at least in part, on account of his political beliefs. That is, a reasonable adjudicator would be compelled to conclude that the FARC, by threatening a government-affiliated person after that person made his anti-FARC views known, had threatened persecution at least in part on account of the victim's political beliefs. As the Second Circuit has explained:

> [P]ersecution on account of one ground [does not] preclude[] a well-grounded fear of future persecution on account of another. [The petitioner] did testify, as the BIA emphasized, that the FARC [initially] targeted her because of her knowledge of her computers, a reason unrelated to political opinion. But she also testified that she would be targeted by the FARC in the future for betraying them, which, when coupled with the government's unwillingness to control the FARC, could well qualify as persecution for an imputed political opinion (opposition to the FARC).

Delgado, 508 F.3d at 706-07. Threatening a person with death for not collaborating with the FARC, after the recipient of the

threat made clear that his refusal was "because they go against [his] principles," is persecution on account of political beliefs. (App. at 138.)

Although our review of the BIA's conclusion that a person does not have a well-founded fear of persecution is deferential, the BIA may not simply overlook evidence in the record that supports the applicant's case. See BinRashed, 502 F.3d at 673; see also Valdiviezo-Galdamez, 502 F.3d at 289; Mema v. Gonzales, 474 F.3d 412, 419 (7th Cir. 2007) ("An applicant for asylum is entitled to a reasoned analysis, not one which wholly disregards relevant, probative evidence."). In this case, the BIA overlooked the inescapable political overtones in the FARC's pursuit of Espinosa-Cortez, and it completely disregarded evidence showing that the FARC knew of Espinosa-Cortez's anti-FARC principles, even as the guerrillas threatened him for not betraying those principles. Under these circumstances, a reasonable factfinder would be compelled to conclude that the threats levied by the FARC were motivated, at least in part, by a political opinion the FARC imputed to Espinosa-Cortez. See 8 U.S.C. § 1252(b)(4)(B).

In granting Espinosa-Cortez's petition, we do not hold that any person affiliated with a foreign government who is threatened by an anti-government organization has necessarily been threatened on the basis of imputed political opinion. In this case, Espinosa-Cortez (1) testified about his long-term association with the Colombian government and military, (2) made his living by providing support to those institutions, (3) would not have come to the guerrillas' attention but for his relationship with the government and military, (4) rebuffed repeated overtures from the FARC to join with them, and (5)

expressly made his anti-FARC opinions known to the FARC agents attempting to recruit him. Under these circumstances, the BIA's conclusion that the FARC's threats were not centrally motivated by a political opinion the guerrillas imputed to Espinosa-Cortez is not supported by substantial evidence in the record.

## III.

For the foregoing reasons, we will grant the petition for review.

-28-