In the

# United States Court of Appeals

## For the Seventh Circuit

No. 09-3792

DORIS MARTINEZ-BUENDIA,

*Petitioner,*

*v.*

ERIC H. HOLDER, JR., Attorney General
of the United States,

*Respondent.*

Petition for Review of an Order of the
Board of Immigration Appeals.

ARGUED MAY 19, 2010—DECIDED AUGUST 10, 2010

Before FLAUM, MANION, and HAMILTON, *Circuit Judges.*

FLAUM, *Circuit Judge.* Petitioner Doris Martinez-Buendia appeals her denial of asylum and withholding of removal. Martinez-Buendia is a fifty-year-old optometrist from Colombia. She came to the United States in 2005 and applied for asylum on the ground that she was being persecuted by the Revolutionary Armed Forces of Colombia (the Fuerzas Armadas Revolucionarias de Colombia—commonly known as the "FARC") on account of her anti-FARC political position and her in-

volvement with a social group called the "Health Brigades." About two years before Martinez-Buendia fled Colombia, the FARC began harassing her with phone calls and letters demanding that she give public credit to the FARC for the health care work she organized in rural communities through the Heath Brigades. As Martinez-Buendia continually refused the FARC's demands, the FARC's actions grew increasingly violent towards her. The FARC escalated from making threatening phone calls and leaving threatening letters to attacking a Health Brigade caravan and kidnaping her sister. After Martinez-Buendia's sister escaped, the FARC kidnaped Martinez-Buendia's brother-in-law. The final incident before Martinez-Buendia fled involved a FARC member following Martinez-Buendia into a cab while she was delivering school supplies to an under-resourced school, holding a gun to her head, and threatening that if she did not give the FARC credit for the Health Brigades, they would do far worse to her than they did to her sister. Upon arriving in the United States, Martinez-Buendia filed for asylum, withholding of removal, and relief under the Convention Against Torture. An Immigration Judge ("IJ") denied her application in an oral decision on March 26, 2008. The Board of Immigration Appeals (the "Board") affirmed the IJ's decision on October 15, 2009 on the ground that Martinez-Buendia had not established that the past persecution she suffered in Colombia was on account of her political opinion or membership in a particular social group. This appeals follows. For the reasons set forth below, we reverse the decision of the Board and grant the petition for review.

## I. Background

### A. Martinez-Buendia's Experiences with the FARC

As an initial matter, we note that the facts of this case are undisputed. Martinez-Buendia was the only witness to testify at the hearing and the IJ found her completely credible.

Martinez-Buendia is a Colombian citizen from Bogota who has dedicated her life to helping others. She is a optometrist and holds a master's degree in health administration. Martinez-Buendia attended university in the mid-1980s, where she became involved in a clinical practicum providing free health services to impoverished communities in Colombia. Her practicum experience set her down a career path of providing health services to communities in need. In 2000, Martinez-Buendia began organizing Health Brigades, groups of volunteer health care providers and other individuals who travel to remote areas of Colombia to provide health services. The Health Brigades organized by Martinez-Buendia generally operated in areas around Barranquilla, where Martinez-Buendia lived and worked, and Bogota, where Martinez-Buendia's family lived. In addition to her work organizing Health Brigades, Martinez-Buendia also taught courses at the Metropolitan University in Barranquilla and worked as an optometrist. Martinez-Buendia is unmarried. Her mother and five siblings all still live in Bogota.

Beginning in 2004, members of the FARC began contacting Martinez-Buendia by telephone and leaving notes at her office, on her car, and at her home demanding that she start publicly attributing her Health

Brigade work to FARC. The FARC members threatened
to harm Martinez-Buendia if she did not comply. At
first Martinez-Buendia ignored the threats because she
thought they were pranks by her students. However, in
November 2004 it became clear that these threats
were not a prank. That month, Martinez-Buendia orga-
nized a Health Brigade trip to the municipality of
Icononzo. Martinez-Buendia's sister and brother-in-law
were participating in this trip. While traveling to
Icononzo, a group of FARC members intercepted the
Health Brigade. The FARC members read the names of
the Health Brigade members from a list to the group,
and physically attacked several members of the Health
Brigade, including Martinez-Buendia. During the commo-
tion, a government helicopter flew by and began shooting
at the FARC members. Once the shooting began, the
FARC members quickly grabbed several members of the
Health Brigade, including Martinez-Buendia's sister,
Mercedes. Martinez-Buendia heard one of the FARC
members say, "I have Doris already," which she believes
meant that the FARC intended to capture her instead
of her sister. The FARC also spray-painted the Health
Brigade cars with statements such as "S.O.B. dogs from
the government." Martinez-Buendia and her brother-in-
law managed to get to the next town and get a new
vehicle to get to Bogata. Once they returned home
they called the police. The Department of Security Admin-
istration installed a recording device on Mercedes's
phone to intercept any calls from the FARC.

Over the next few months Martinez-Buendia received
several phone calls from the FARC on her home phone

and on Mercedes's phone. During one of those phone calls, the FARC member told Martinez-Buendia that they had her sister and that they would kill her unless Martinez-Buendia agreed to work for the FARC cause. Martinez-Buendia testified that she always hung up and never spoke to the person on the phone. When the IJ questioned Martinez-Buendia about why she did not go along with the FARC to save her sister, Martinez-Buendia said that she was unable to work for the FARC "because it is a rebel group to the democracy of Colombia, because they have harmed a lot of Colombia and my beginnings would not let me or allow me to do this." In February 2005, Martinez-Buendia was in Bogota visiting her mother. While at her mother's house, Mercedes showed up in the middle of the night visibly beaten, wearing men's clothing, and very thin from having been infected with a parasite. Martinez-Buendia testified that Mercedes told the family that she escaped in the night. Martinez-Buendia also testified, and provided documentation, that Mercedes suffered, and continues to suffer, severe psychological damage from her experience in captivity. In March 2005, Mercedes's husband was captured by the FARC and died in their custody because he did not have access to proper medicine.

Because of Mercedes's kidnaping, Martinez-Buendia did not organize any Health Brigades during 2005. However, at some point in 2005, Martinez-Buendia did go to a community meeting in Puerto Colombia. After dropping off school supplies at a school in Puerto Colombia, Martinez-Buendia got into a taxi. An armed member of the FARC followed her into the taxi, pointed a gun

at her, and threatened to kill her unless she began doing work for the FARC. The individual gave Martinez-Buendia thirty days to appear before the FARC. After this incident, Martinez-Buendia fled to the United States and applied for asylum.

**B. Procedural History**

Martinez-Buendia filed an application for asylum, withholding of removal, and relief under the Convention Against Torture on October 28, 2005. The Department of Homeland Security initiated removal proceedings against her on December 8, 2005. After a series of continuances, Martinez-Buendia had a hearing before an IJ on March 26, 2008. She had an attorney present. The IJ found Martinez-Buendia's testimony consistent and credible. The IJ also found that Martinez-Buendia had suffered harm that rose to the level of past persecution. However, the IJ denied relief because he found that Martinez-Buendia did not suffer past persecution on account of her political opinion or her membership in a particular social group. Martinez-Buendia appealed the IJ's decision to the Board. The Board held that the FARC's actions were motivated by the FARC's own political agenda and not by a desire to punish Martinez-Buendia for her political opinion. The Board also held that Martinez-Buendia had not established that she belonged to a cognizable social group because the Health Brigades did not have a common quality binding its members that is either unchangeable or fundamental to their identities. In the alternative, the Board held

that Martinez-Buendia failed to show that the FARC
persecuted her to punish or overcome her membership
in the Health Brigades. Because Martinez-Buendia
did not demonstrate that her past persecution was on
account of her political opinion or social group member-
ship, she could not establish a well-founded fear of per-
secution on account of those factors.

## II. Discussion

This is an appeal from the Board's denial of relief. The
board issued its own opinion, independent from the IJ's
oral order. Therefore, we review only the Board's opinion.
*Moab v. Gonzales*, 500 F.3d 656, 659 (7th Cir. 2007). We
review the Board's determination of facts, including
that Martinez-Buendia failed to establish statutory eligi-
bility for asylum, for substantial evidence. *Mabasa v.
Gonzales*, 455 F.3d 740, 744 (7th Cir. 2006); 8 U.S.C.
§ 1252(b)(4)(B) (stating that factfindings by the agency
are "conclusive unless any reasonable adjudicator would
be compelled to conclude to the contrary"). Under this
standard, we only reverse "if the evidence presented . . .
was such that a reasonable factfinder would have to
conclude that the requisite fear of persecution existed."
*INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992).

To qualify for asylum, an applicant must show a rea-
sonable possibility of persecution on account of her race,
religion, nationality, membership in a particular social
group, or political opinion. 8 U.S.C. §§ 1158(b)(1)(A),
1101(a)(42). Because Martinez-Buendia filed her claim
in 2005, the REAL ID Act of 2005 governs. The Act

requires Martinez-Buendia to show that one of five pro-
tected grounds was or would be a central reason for
her persecution. *See* 8 U.S.C. §§ 1101(a), 1158(b)(1)(B). A
showing of past persecution creates a well-founded fear
of future persecution. 8 U.S.C. § 1101(a)(42)(A). The IJ
and the Board both found that Martinez-Buendia faced
persecution in the past. Therefore, the only findings
challenged in this appeal are the Board's findings that
the persecution Martinez-Buendia faced was not be-
cause of her political opinion and that the persecution
was not because of her membership in a particular
social group.

In proving that she was persecuted on account of her
political opinion, an imputed political opinion, or her
membership in a social group, Martinez-Buendia must
put forth either direct or circumstantial evidence that
the FARC's prior persecution of Martinez-Buendia was
motivated by one of those factors. *Elias-Zacarias*, 502 U.S.
at 483. However, in certain cases, "the factual circum-
stances alone may constitute sufficient circumstantial
evidence of a persecutor's . . . motives." *Espinosa-Cortez
v. Attorney General*, 607 F.3d 101 (3d Cir. 2010) (quoting
*Canales-Vargas v. Gonzales*, 441 F.3d 739, 744 (9th Cir. 2006)).

## A. Persecution on Account of Political Opinion

The Board found that Martinez-Buendia did not rea-
sonably show that the FARC targeted her on account of
her actual or perceived political opinion. In coming to
this conclusion, the Board mainly relied on three cases:
*Hernandez-Baena v. Gonzales*, 417 F.3d 720 (7th Cir. 2005);

*Matter of S-E-G, et al.*, 24 I. & N. Dec. 579, 588-89 (BIA 2008); and *Matter of T-M-B-*, 21 I. & N. Dec. 775 (BIA 1997). Before this court, the government relies on the same three cases as the Board and additionally points our attention to *INS v. Elias-Zacarias*, 502 U.S. 478 (1992) and *Espinosa-Cortes v. Attorney General*, 607 F.3d 101 (3d Cir. 2010).

*INS v. Elias-Zacarias* is the predecessor to the other pertinent cases, so we begin there. In *Elias-Zacarias* the Supreme Court addressed the question of "whether a guerrilla organization's attempt to coerce a person into performing military service necessarily constitutes persecution on account of political opinion." 502 U.S. at 579. The Court determined that the question was fact-specific and therefore such coercion was not necessarily persecution on account of political opinion. *Id.* Under the specific facts of *Elias-Zacarias*, the Court found that the guerrilla organization's attempt to coerce the petitioner into performing military service did not constitute persecution on account of political opinion. *Id.* at 483. Two uniformed guerrillas went to the home of Elias-Zacarias when he was eighteen and attempted to recruit him to fight with them. *Id.* at 479-80. He refused to join the guerrilla army and fled to the United States out of fear of future persecution. *Id.* After he fled, the guerrillas returned twice more to attempt to recruit him. *Id.* Elias-Zacarias testified that he refused to join the guerrillas because he was afraid the government would retaliate against him for joining. *Id.* In assessing these facts, the Court rejected the Ninth Circuit's contention that "a guerrilla organization's attempt to conscript a person into its military forces necessarily constitutes persecution

on account of political opinion because the person resisting forced recruitment is expressing a political opinion hostile to the persecutor." *Id.* at 481. In rejecting the Ninth Circuit's position, the Court reasoned that:

> Even a person who supports a guerrilla movement might resist recruitment for a variety of reasons—fear of combat, a desire to remain with one's family and friends, a desire to earn a better living in civilian life, to mention a few. The record in the present case not only failed to show a political motive on Elias-Zacarias' part; it showed just the opposite.

*Id.* at 482. The Court went on to state that Elias-Zacarias had to show that the record compelled the conclusion that the guerrillas will persecute him because of his political opinion, rather than because of his refusal to fight with them. Based on the limited evidence that the guerrilla group attempted to recruit Elias-Zacarias and he refused, the Court found that there was not sufficient evidence to compel the finding that he was persecuted on account of his political opinion.

Contrary to the government's position in this appeal, Elias-Zacarias does not stand for the proposition that attempted recruitment by a guerrilla group will never constitute persecution on account of the asylum seeker's political beliefs. Rather, *Elias-Zacarias* instructs courts to carefully consider the factual record of each case when determining whether the petitioner's fear of future persecution due to his refusing recruitment attempts constitutes persecution on account of political beliefs. *Elias-Zacarias* does not draw a bright-line rule one way or the other. Therefore, we turn our attention to the record.

The record in this case demonstrates that Martinez-Buendia was persecuted in the past, and therefore has a legitimate fear of future persecution, on account of her political beliefs. Unlike the record in *Elias-Zacarias*, the specific facts of this case make it clear that Martinez-Buendia politically opposed the FARC and that her political beliefs were the reason for her refusal to cooperate with the FARC. While the reason behind Elias-Zacarias's refusal to fight with the guerillas was not clear, the record in this case is explicit and uncontradicted: Martinez-Buendia refused to align with the FARC because of her political views. Unlike the attempt to recruit Elias-Zacarias to fight, the FARC did not ask Martinez-Buendia to do anything she would not otherwise do, nor did they ask her to refrain from doing something she otherwise would do. The FARC demanded that Martinez-Buendia continue doing what she was doing, but simply allow them to take credit for the political goodwill she engendered with the populations she served. Martinez-Buendia refused because, "[the FARC] is a rebel group to the democracy of Colombia, because they have harmed a lot of Colombia and my beginnings would not allow me to do this." (IJ Hearing Testimony, R. 152.) It is exactly this type of testimony—indicating that the refusal to cooperate was based on a political opinion—that *Elias-Zacarias* was missing.

Also, unlike the record in *Elias-Zacarias*, the record in this case makes it clear that the FARC imputed an anti-FARC political opinion to Martinez-Buendia which led to the increasingly violent nature of their persecution of her. There is uncontested evidence in the record that

the FARC views members of Health Brigades as
political opponents. A 2002 Report by the Immigration
and Naturalization Service indicates that individuals
who do humanitarian work, such as working with
Health Brigades, are at a "great risk" of attack by the
FARC or other armed groups in Colombia. The report
quotes an Amnesty International Colombia Country
Specialist, "You cannot do humanitarian work without
being perceived as a political threat by one or all of the
armed groups." (R. 387.) The report finds that this is
largely because the various political groups in Colombia
use Health Brigades to garner political support. (*Id*.) This
report leads us to the conclusion that the FARC viewed
Martinez-Buendia as a political opponent and sought
to sway her politically so that they could take credit for
the humanitarian work that she performed.

Martinez-Buendia's persistent refusal to politically
align with the FARC despite the increasingly violent
nature of the persecution would have only strengthened
the FARC's belief that she was a political opponent. The
FARC initially attempted to recruit Martinez-Buendia
through phone calls and threatening notes. If Martinez-
Buendia had fled to the United States after only these
recruiting attempts and sought asylum, the government's
contention that this case is on all fours with *Elias-Zacarias*
still would not be appropriate, but it would be much
closer—recruitment attempts were made; the individual
ignored or rejected the attempts; the individual fled to the
United States and sought asylum. However, Martinez-
Buendia's story does not end there. After these early
refusals, that the FARC escalated the violent nature of

their recruitment attempts. The FARC's increasingly violent actions, which the Board found amounted to persecution, came in response to Martinez-Buendia's refusal to politically align her humanitarian work with the FARC. While it may be unclear whether the FARC initially targeted her to overcome her political stance, the later persecution came as a result of her refusal to cooperate with the FARC to advance their political agenda. This post-refusal persecution is a key difference between Martinez-Buendia's situation and that of Elias-Zacarias, and leads us to the inference that the FARC targeted Martinez-Buendia to overcome the anti-FARC political opinion they attributed to her. *See Delgado v. Mukasey*, 508 F.3d 702, 706-07 (2d Cir. 2007) ("It did not necessarily follow that, because Petitioner's original kidnaping had not been politically motivated, her refusal to provide further technological assistance did not support a well-founded fear of future persecution on account of an imputed political opinion."); *Espinosa-Cortez*, 607 F.3d 101 (distinguishing Espinosa-Cortez's situation from Elias-Zacarias's situation in part because the Espinosa-Cortez family was approached by the FARC on multiple occasions and the petitioner repeatedly refused to cooperate with the FARC). Furthermore, when the FARC spray-painted the Health Brigade cars with "S.O.B. dogs from the government," they made it clear that they interpreted Martinez-Buendia's repeated refusal to cooperate as her expressing an anti-FARC political opinion.

The other cases relied on by the Board and the government similarly only push us toward the conclusion that Martinez-Buendia's case does compel the conclu-

sion that she was persecuted on account of her political
beliefs. For example, the Board relied on *Hernandez-Baena
v. Gonzales*, 417 F.3d 720 (7th Cir. 2005). In *Hernandez-
Baena*, we found that a man seeking asylum did not
demonstrate that he was persecuted on account of his
political beliefs when he had been threatened by the
FARC because of his refusal to sell FARC members
certain military supplies. 417 F.3d at 721-22. It was illegal
for Hernandez-Baena to sell military supplies to anyone
without the proper credentials; the FARC members
lacked such credentials. *Id.* After the petitioner refused
to sell the goods to the FARC member, another FARC
member came to the store and threatened to kill him. *Id.*
The petitioner fled his home that night and abandoned
his store. About a week after he fled, a FARC member
called him and told him that his "death sentence" had
been signed. *Id.* No further calls came. Seven months later,
the petitioner fled the country and came to the United
States. *Id.* The IJ found, and the Board affirmed, that the
FARC's conduct did not amount to persecution, and
even if it did amount to persecution, such persecution
was not on account of the petitioner's political opinion.
*Id.* at 722. In affirming this decision, we pointed to the
petitioner's own testimony that he refused to comply
with the FARC members because he did not want to go to
jail for violating Colombian law. *Id.* at 723-24. It is this
testimony that makes *Hernandez-Baena* inapplicable to
this case. Both Hernandez-Baena and Martinez-Buendia
were persecuted, assuming the threats Hernandez-Baena
received constituted persecution, because they refused
to cooperate with the FARC. However, Hernandez-

Baena refused to cooperate because he did not want to break the law, while Martinez-Buendia refused to co-operate because she was politically opposed to the FARC. If political opposition is the reason an individual refuses to cooperate with a guerrilla group, and that individual is persecuted for his refusal to cooperate, logic dictates that the persecution is on account of the individual's political opinion; if the refusal to cooperate is for a non-political reason, the persecution would not be on account of the individual's political beliefs (unless the petitioner can show that the persecutor imputed a particularly political belief on him based on his refusal to cooperate).

The two BIA decisions relied on by the Board and the respondents are similarly distinguishable. In *In re T-M-B-*, the Board held that the individual applying for asylum could not show that she was persecuted on account of her political opinion when revolutionaries persecuted her due to her failure to provide them with financial contributions. The BIA found that the revolution-aries' motive was economic, not political, which was evidenced by the revolutionaries' attempts to extort money from a large number of individuals with finan-cial backgrounds similar to that of the individual at issue. In *Matter of S-E-G, et al.*, 24 I. & N. Dec. 579 (BIA 2008), the BIA held that the two individuals seeking asylum after they refused to join the MS-13 gang could not demonstrate that they were persecuted or would be persecuted on account of their political opinions. Neither case is applicable here because their records lack evidence that the petitioner refused the demands of the persecutor because of his or her political opinion.

This case is much more similar to *Espinosa-Cortez* than any case relied on by the Board. In *Espinosa-Cortez*, the Third Circuit found that the Espinosa-Cortez family did have a reasonable fear of persecution on account of a political opinion that the FARC imputed to the family members. 607 F.3d 101. The court relied on three key factors that distinguish *Espinosa-Cortez* from *Elias-Zacarias* and compelled the conclusion that the situation warranted asylum for the family: (1) Espinosa-Cortez had a direct affiliation with the Colombian government and military, (2) Espinosa-Cortez engaged in protracted resistance to the FARC's recruitment efforts, and (3) Espinosa-Cortez made his anti-FARC stance known to the FARC. *Id.* at 109-14. Martinez-Buendia's situation is similar in all three aspects. First, it is clear that the FARC considered Martinez-Buendia to be connected to the government. Although Martinez-Buendia's political affiliations were not as direct as those of Espinosa-Cortez, who was openly active in the Liberal Party, the message the FARC spray-painted on Martinez-Buendia's car at the time they kidnaped her sister shows that they attributed pro-government political views to Martinez-Buendia. This fits with the other evidence in the record that the FARC views humanitarian workers, including those involved in Health Brigades, as political opponents. Second, similar to Espinosa-Cortez, Martinez-Buendia resisted numerous recruitment attempts and threats. 607 F.3d at 111-13. Even more compelling than what occurred to the Espinosa-Cortez family, where the

FARC recruitment efforts never escalated past threats[1], Martinez-Buendia faced intense violence and still refused to cooperate. Lastly, while there is no evidence that Martinez-Buendia directly communicated her anti-FARC political opinion to a FARC member as clearly as Espinosa-Cortez did, the only logical conclusion that the FARC could have drawn from her non-responsive-ness in the face of their extreme violence is that she was politically opposed to their cause. Martinez-Buendia's act of hanging up the phone when FARC members called threatening to kill her sister if she did not comply is a clear non-verbal statement that she opposed the FARC.

## B. Persecution on Account of Membership in a Social Group

Martinez-Buendia also challenges the Board's findings that the Health Brigades are not a cognizable social group for the purpose of asylum and that, if the Health Brigades were a cognizable social group, the FARC did not perse-cute Martinez-Buendia on account of her membership in the Health Brigades. Because this record compels the conclusion that Martinez-Buendia was persecuted in the past on account of her political opinion, and therefore

---

[1] Espinosa-Cortez was kidnaped in 1984 due to his wealth. However, because it was clear that the 1984 kidnaping had no connection to Espinosa-Cortez's political opinions and because it was not one of the predicate occurrences to the family fleeing Colombia, it was not relied on at the hearing.

has a legitimate fear of future persecution on account of her political beliefs, we need not reach the question of whether she also qualifies for asylum due to persecution on account of her membership in a social group.

### III.  Conclusion

For the reasons stated above, we grant the petition for review.

HAMILTON, *Circuit Judge*, concurring.  I concur fully in the court's opinion, which shows that we must grant the petition for review because petitioner Martinez-Buendia was persecuted by the FARC on the basis of her political opinions. I write separately to note that I believe the Board of Immigration Appeals also applied too narrow a concept of a "social group" when evaluating petitioner's leadership in the *brigadas de salud* (Health Brigades) in Colombia. If we were not ordering the Board to grant refugee status to petitioner based on political persecution, I would order a remand to the Board for further development and consideration of the social group issue.

To gain asylum in the United States, it is not enough for a refugee to show only that she was persecuted or

at grave risk in her home country. She must also show that she suffered or faces persecution for a statutory reason: "on account of race, religion, nationality, member-ship in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42) (definition incorporated in 8 U.S.C. § 1158(b)(1)(A)).

In this case, the Board characterized petitioner's social group argument as one based on "membership in a group consisting of educators and healthcare profes-sionals 'who are able to go places . . . the FARC . . . cannot . . . and win the hearts and minds of the citizens.'" According to the Board, the immigration judge properly rejected that argument because petitioner had not shown a "common quality binding the group members that is either unchangeable or fundamental to their identities such that a cognizable group exists." Nor, said the Board, had she shown "that the FARC was targeting her to punish her for or to overcome her group membership."

In my view, the Board's rejection of this argument was based on two closely related errors. First, it did not recog-nize that the statutory definition can reach a social group defined by its activities, at least where the persecu-tion is based on those activities. Second, the Board failed to consider the extent to which this petitioner was acting as a matter of conscience when she acted so as to draw the attention and wrath of the FARC.

*Social Group Defined by Activity that Draws Persecution*: If the FARC's only reason for targeting petitioner Martinez-Buendia was that she refused to act as a means to the FARC's ends, she would be like many other Colombian

citizens who are ineligible for asylum in the United States. They are targeted not as a coherent group with a set of deeply-held beliefs, but rather as one of an undifferentiated mass of people who suffer terribly because of the FARC's brutal methods. See, *e.g.*, *Delgado v. Mukasey*, 508 F.3d 702, 706 n.2 (2d Cir. 2007) (rejecting petitioner's claim that Colombian computer experts constitute a social group because she was kidnapped to help the FARC set up a computer network); accord, *Ahmed v. Ashcroft*, 348 F.3d 611, 619 (7th Cir. 2003) (no "social group" claim from "danger . . . affecting the population in a relatively undifferentiated way"). Without more, nothing would distinguish petitioner from anyone else the FARC sought to coopt for its mission, and she would be ineligible for asylum in the United States.

The Board erred as a matter of fact and law, however, when it characterized petitioner's proposed social group as one defined merely by the fact that the FARC targets members to get access to people and resources. The evidence in this record goes much further toward distinguishing members of the Health Brigades from the tragic and undifferentiated mass of other FARC victims. Petitioner was not targeted solely because she was in a position to help the FARC reach the rural poor. She relied on a 2002 report published by the Immigration and Naturalization Service itself to show that the Health Brigades can qualify as a social group under United States immigration law. The report explains that the FARC is engaged in a systematic campaign targeting humanitarian groups generally—and the Health Brigades specifically—because they are often aligned with

political groups opposed to the FARC. The FARC sees these humanitarian groups as its competitors for control over the towns and regions where both they and the FARC operate. These assertions, like all the evidence petitioner presented, were credited by the immigration judge and deserved greater consideration by the Board.

With respect to this evidence, the Board erred as a matter of law in requiring petitioner to show a "common quality binding the group members together that is either unchangeable or fundamental to their identities." The decision of this court cited by the Board, *Najafi v. INS*, 104 F.3d 943 (7th Cir. 1997), did not actually adopt such a demanding standard. That case is consistent with the Board's own broader standard: a group of people who are "unable by their own actions, or as a matter of conscience should not be required, to avoid persecution." *In re Acosta*, 19 I. & N. Dec. 211, 233 (BIA 1985); accord, *Lwin v. INS*, 144 F.3d 505, 512 (7th Cir. 1998) (adopting standard from *Acosta*).

In applying that standard, we have gone so far as to hold that a social group may be defined merely by the fact that its members share a certain characteristic and are systematically persecuted solely because they share that characteristic. In *Tapiero de Orejuela v. Gonzales*, 423 F.3d 666, 672 (7th Cir. 2005), we found that the petitioners were members of a persecuted social group because the FARC had persecuted them based on their membership in "a distinct social group: the educated, landowning class of cattle farmers targeted by FARC." There was no evidence in *Tapiero de Orejuela* that Colom-

bian cattle farmers feel their cattle-farmer identity so strongly that it could be considered fundamental, or that one becomes a cattle farmer out of a moral or near-religious belief that it is the right thing to do. There was some limited evidence that the petitioners' identity in that group had become immutable. Most important, however, there was evidence that the FARC systematically persecuted educated cattle farmers as a group, and that it persecuted these specific educated cattle farmers simply because they belonged to that group. That was enough to find a protected "social group."

Defining a social group based solely on its persecution as a social group would not be inconsistent with the Board's decision in *Acosta*, which reasoned that "social group" should be defined no more broadly than the narrower categories of eligibility like race and nationality. When a person is persecuted because of her race or nationality, we do not ask her to prove how deeply she feels her racial or national identity. Nor must she prove that she feels a kinship with people who share that identity. True, those characteristics are immutable, and many people may in fact feel a strong racial or national identity in part because that identity cannot be changed. But that is not why we provide asylum to people persecuted because of their race or nationality. We provide asylum because those people are being persecuted simply for who they are. I can think of no good reason why the statute would treat differently a member of a social group who is persecuted for who she is, at least as long as the petitioner, as in *Tapiero de Orejuela*, can show that the group is coherently defined and that she

was indeed persecuted simply because she is a member of the group.

*Social Group Membership Based on Conscience*: Because of the Board's second error in this case, however, petitioner's social-group theory does not require the Board or the court to go so far as we did in *Tapiero de Orejuela*. The Board's second error was to downplay both the *Acosta* standard's extension to persecuted social groups defined by conscience and the facts showing that petitioner was persecuted for acting according to her conscience. Petitioner offered uncontested evidence that she was an active leader in a group of people who provided health care to the poor, and that she, at least, engaged in that activity as a matter of conscience. For the same reasons of conscience, she refused to leave the group in response to the FARC's threats and kidnaping. The immigration judge credited her testimony. On this record, we can and should acknowledge her dedication, and her courage.

If petitioner and other Health Brigade members were persecuted because they were providing health care to the poor as a matter of religious faith and practice, there would be little doubt that they could qualify for asylum. If petitioner and other Health Brigade members were providing health care as an exercise of their secular ethical values that also can fairly be described as matters of conscience, the question should be no more difficult under the *Acosta* standard.

In sum, the facts and law relevant to petitioner's claim for refugee status as a member of a persecuted social group deserved closer consideration. Future petitioners may offer evidence that they joined groups like the

Health Brigades as a matter of conscience and that they have been persecuted, or that they face future persecution, on account of their membership in and work on behalf of the Health Brigades. They should not be denied asylum simply because that membership may appear more fluid than membership in a racial, ethnic, or religious group, or because their involvement is the result of secular ethical values instead of religious faith.